# Wilson's Appeal.

1. Where a testator, when in undoubted health of body and mind, has executed a will by which he has devised and bequeathed all his property to his relations, and subsequently, when in great age and suffering from great physical infirmity, executes another will through the procurement and instrumentality of a trusted friend and adviser, whereby the provisions of the former will are radically altered and a substantial benefit given to the friend and adviser aforesaid, a proper case is presented for the court to grant an issue to determine whether undue influence has not been exerted to procure the execution of the will last named.

2. In such case, the burden is upon the beneficiary under the last named will to prove affirmatively all the circumstances connected with the drawing of it. He must also make it appear that the alleged testator was laboring under no mistaken apprehension as to the value of his property and the amount he was giving to his confidential adviser, and that the gift was his free and intelligent act.

3. Cuthbertson's Appeal, 1 Outerbridge 163, followed.

4. Where, in a case like that set forth above, the charge of undue influence admittedly requires judicial investigation, and there is also an allegation of mental unsoundness, supported by the evidence of the attending physician and other witnesses, it is not proper to restrain the inquiry to the charge of undue influence alone. Both charges are necessarily so connected with each other that the inquiry should extend to both.

February 2d 1882. Before Sharswood, C. J., Mercur, Gordon, Trunkey, Sterrett and Green, JJ. Paxson, J., absent.

Appeal from a decree of the Orphans' Court of *Philadelphia County*: Of January Term 1882, No. 87.

Appeal of Mary Ann Wilson from a decree of the said court awarding an issue to determine whether a certain paper purporting to be the last will and testament of James Rea, deceased, was procured by undue influence, but refusing to award an issue to determine whether the said James Rea was of

sound and disposing mind, memory and understanding at the time of the execution of said paper.

A testamentary paper purporting to be the last will and testament of James Rea, dated October 28th 1880, was admitted to probate by the Register of Wills, November 10th 1880. From this decree of probate, the said Mary A. Wilson, a granddaughter of the testator, and a beneficiary under a former will, appealed to the Orphans' Court, and prayed for an issue to be awarded, to determine "whether the said testator, James Rea, at the time of the said paper writing, alleged to be the last will and testament of the said James Rea, was written and executed, was of sound and disposing mind, memory and understanding; and whether the said alleged last will and testament was procured by imposition and undue influence exercised over the mind of the testator."

The testimony taken by an examiner appointed by the Orphans' Court showed the material facts to be as follows: James Rea died November 5th 1880, in the eighty-ninth year of his age, after an illness of about two weeks. On October 6th 1873, when in full mental and bodily health, he had executed a will in which he devised the bulk of his estate to his sisters and their children, and to the son of a friend with whom he had resided many years, and the daughter of another friend, then deceased, of whose will he was an executor.

William Wood had been the confidential friend and intimate associate of James Rea from his boyhood, and Mr. Rea's relations with the family of Mr. Wood were also most intimate. When Mr. Rea was taken ill with pleuro-pneumonia, on October 22d 1880, he sent for William Wood, who came to the house where he boarded, and daily thereafter nursed him, until he died, on November 5th. On the fifth day of his illness Mr. Rea requested Mr. Wood to send for Thomas B. Prosser, Esq., a member of the bar and his legal adviser, to draw his will. Mr. Prosser called the same day and had some conversation with Mr. Rea, in relation to his will, in the presence of Mr. Wood. Mr. Rea gave directions about the disposition of a cemetery lot. At this interview Mr. Rea appeared unprepared to dispose of the rest of his estate; he said that he would think over that. Mr. Prosser then said: "that was at his pleasure, and if he would make a memorandum, or have it made and sent to me, of the manner in which he would desire it disposed of, I would prepare it in proper form and bring it to him, read it to him, and if it was satisfactory he could execute it. I left then."

On cross examination Mr. Prosser said: "He was not so well on the first visit as he was on the two following days, and I, therefore, was glad when he did not talk so much about his will on

that day, and I thought it would be better to have memorandums made and sent to me."

On the following day Mr. Wood took to Mr. Prosser a memorandum in his (Wood's) handwriting, for Mr. Rea's will, and also gave him verbal instructions as to Mr. Rea's testamentary intentions. From these instructions Mr. Prosser prepared the will, and called on Mr. Rea the same day, finding Mr. Wood in his room. Mr. Rea recognized him, and the will was read to him by Mr. Prosser, Mr. Rea saying, in answer to a question, that he heard and understood it. He also directed some alterations in favor of Mr. Wood's son, which were inserted by Mr. Prosser who then left, and returned the following day with a corrected copy of the will, which was again read over to Mr. Rea. He again directed one or two alterations, which were interlined and noted, and the paper was then executed and acknowledged as his will by Mr. Rea, in bed, Mr. Prosser and a gentleman whom he brought with him from his office, signing as subscribing witnesses.

By this will the bulk of the testator's estate, amounting to over $4,000 in value, was devised to William Wood and members of his family, none of whom had been beneficiaries under the will of 1873, and no one of the testator's own kindred, who had been beneficiaries under the former will, was mentioned therein.

The evidence in relation to the mental condition of the testator about the time of executing the will was conflicting. On the one hand, Mr. Prosser testified that he thought him as fully capable of transacting business when he saw him sick as when he had seen him well; and in this he was substantially corroborated by several other witnesses. On the other hand, a physician who had attended him said that on the third day the disease reached its fullest intensity, and continued at this point for about a week, during which period he had "rapid pulse, an expression of indifference in the countenance, and lying in a stupor;" that on the eighth day of his illness (on which day the will was executed) the stupor indicated that the brain was becoming more seriously involved, and witness did not think he was mentally in a condition to have understood and comprehended the will in question. On cross examination, this witness admitted that "he never examined Mr. Rea with a view to find his mental condition or ability to make a will." Other witnesses testified that on the day in question Mr. Rea seemed to be in a stupor, he said that they kept him drunk with stimulants, and that his mind would wander and his conversation was incoherent.

The court, in an opinion by Hanna, P. J., awarded an issue to try the question of undue influence, on the principle ruled in

Boyd *v.* Boyd, 16 P. F. S. 283 ; Frew *v.* Clarke, 30 P. F. S. 170 ; Cuthbertson's Appeal, 1 Out. 163, that where a person in a confidential relation to a testator whose mind is in some degree weakened by age, infirmity, or disease, writes or procures to be written for him, a will under which such person takes a considerable benefit, the burden of proof is upon him to show that it expresses the true will of the testator, and that he understood the effect of such disposition ; and that this question is properly to be submitted to a jury.

But the court held, on the question of testamentary capacity, that the weight of the testimony was clearly in favor of such capacity, and insufficient to support a verdict against the will.

The court therefore entered a decree, sustaining the appeal, and awarding an issue to the Common Pleas to try the question of undue influence ; and refusing so much of the contestant's demand as asked for an issue to determine the question of the testamentary capacity of the said testator.

Mary A. Wilson thereupon took this appeal, assigning for error the refusal of the court to grant her demand for an issue to determine as well the question of the testamentary capacity of said James Rea, deceased, as the question whether said will had been procured by undue influence.

*Charles C. Lister,* for the appellant.—There was ample evidence of want of testamentary capacity to take the case to a jury, and support a verdict against the will, on that ground alone. But especially as the issue was granted on the question of undue influence, the court erred in dividing the issue prayed for, and refusing that portion of it relating to testamentary capacity. The result would be to exclude evidence of the contents of the former will, which is a material element of the question, and of the testator's declarations prior to the execution of the will in controversy. Under the evidence, the two questions are inseparably connected, and should be tried together. We are entitled to the same issues as were granted in Cuthbertson's Appeal, 1 Out. 163, and Boyd *v.* Boyd, 16 P. F. S. 283.

*J. C. Stillwell,* for the appellees.—The weight of the testimony as to the testator's mental condition, was clearly that he was possessed of sufficient vigor and understanding to make a will. The court below was the judge whether there was sufficient evidence on this point to warrant an issue, and they held decisively that the evidence was insufficient to support a verdict against the will. It is incumbent on the party alleging mental incapacity to show it affirmatively : Kachline *v.* Clark, 4 Wharton 319 ; Boyd *v.* Eby, 8 Watts 66 ; Grabill *v.* Barr, 5 Barr 441 ; Werstler *v.* Custer, 10 Wr. 502 ; Egbert *v.* Egbert,

28 P. F. S. 327.  Notwithstanding temporary mental disorder, the presumption is, still, that a man is competent when he makes his will.  And on the question of testamentary capacity of a dying man, the fact of occasional flightiness or wandering of intellect during his sickness, is generally of very slight importance: McMasters v. Blair, 5 Casey 298.

The court below, while of opinion that there was no evidence in fact of undue influence, thought the case fell within the principle of Boyd v. Boyd and Cuthbertson's Appeal, which shifted the burden of proof to the proponents, and so were constrained to grant the issue upon that question.  This principle is an abstract one of law, and, while we do not think it applies to this case, we are willing to abide by the ruling of the court, and meet our obligation to show the absence of undue influence.  But that principle has no application to the question of mere testamentary capacity.  These are distinct issues, and are so treated in Redfield on Wills.  Either may exist without the other, and yet destroy the will.  There is no necessary connection between them, and where the court feel bound, by a general principle of law, to grant the issue on the quesion of undue influence, they may nevertheless exercise their discretion in granting or refusing it on that of testamentary capacity.  That the court had the right to divide the issues we think there can be no doubt.

Mr. Justice GREEN delivered the opinion of the court, March 13th 1882.

We concur entirely with the learned judge of the court below in the statement of the reasons which induced the court to grant the issue prayed for in this case, to try the question of undue influence.  The opinion expresses very clearly and forcibly the considerations which bring the case within the ruling of Boyd v. Boyd, 16 P. F. S. 283, and Cuthbertson's Appeal, 1 Out. 163.  William Wood was one of the chief beneficiaries named in the will, and he was the main instrument in procuring the preparation and execution of the will in question.  He was, moreover, a trusted and confidential friend and adviser of the testator, who consulted him in relation to his business affairs. The testator had, in 1873, when in undoubted health of body and mind, executed a will in which neither Mr. Wood nor his son and daughter, the other residuary devisees, were mentioned. The changes wrought in that will by the one in controversy, executed seven years later, are of the most radical character. In view of these facts, and of the great age and physical infirmity of the testator, we can not doubt the propriety of an issue to determine whether undue influence was exerted to produce the will in controversy.  The principles stated by the present Chief Justice, in Cuthbertson's Appeal, supra, become

entirely applicable : "Every man who draws a will in his own favor under such circumstances, should know that he will be required to prove affirmatively all the circumstances connected with the drawing of the will, and that it must appear that the alleged testator was laboring under no mistaken apprehension as to the value of his property and the amount he was giving to his confidential adviser. He must make it clearly appear that the gift to him was the free, intelligent act of the testator."

We find ourselves unable, however, to agree with the court below in restricting the issue in this .case, to the question of undue influence alone. There was considerable testimony given in support of the allegation of mental incapacity of the testator at the time of the execution of the will in question. He was nearly eighty-nine years of age. He had been prostrated a few days before by a most severe attack of acute pneumonia; he was in a condition of stupor, which, as the attending physician said, "was becoming more and more serious." The latter also testified, "The delirium was the mildest form of the brain disorder, and the stupor indicated that the brain was becoming more seriously involved." He was taken ill on October 22d 1880, with acute pneumonia involving both lungs and which reached its fullest intensity in about three days, remaining of that character for about a week. The will was executed on the 28th day of October, and the testator died on November 5th following. The sickness continued about two weeks, and in the midst of it, the testamentary paper in controversy was prepared and signed. The attending physician, an entirely disinterested person, who had every opportunity to observe and consider the testator's condition, testified that in his opinion, he was mentally incompetent to make a will. The will in question being read to the witness, he was asked :

Q. From your knowledge of Mr. Rea's condition, do you believe it possible for him to have understood and comprehended such a paper on the eighth day of his sickness? A. I don't think so.

Q. If the will which has been read to you had been properly and carefully explained to him, is it possible that he could have understood it? A. No.

There was much other testimony, from a number of witnesses, who testified to their belief in the mental incapacity of the testator, giving their reasons therefor. We do not propose to repeat or discuss it, as it may come before us hereafter for our consideration. But we are clearly of opinion that, taken in connection with the testimony of the attending physician, it is more than a scintilla of evidence, and is enough to carry the case to a jury. In a case in which the subject of the inquiry is a person of such great age and infirmity, suffering from so

severe an attack of disease, affecting his brain and all his vital powers, and where an investigation of a charge of undue influence is admittedly essential, it is of very doubtful propriety to limit and restrain that investigation to that one matter.

In such circumstances undue influence and mental incapacity are very closely interwoven. It is difficult to separate them by a dividing line in conducting a judicial inquiry. A person of extreme feebleness of intellect is much more easily influenced by undue means, than is one of more vigorous condition. If the issue of mental unsoundness is excluded, it may seriously impair the thoroughness of the investigation as to undue influence, by limiting the scope of the admissible testimony. We said in Cuthbertson's Appeal, "Where the alleged testator is shown by evidence to be weak in mind, whether arising from age, bodily infirmity, great sorrow, or other cause tending to produce such weakness, though not sufficient to create testamentary incapacity, and the person whose advice has been sought and taken, receives a large benefit under the instrument propounded as a will, it must be shown affirmatively that the alleged testator had full understanding of the nature of the disposition contained in it." In the present case there was a former will with entirely different provisions, and that circumstance might be a most material element in determining the question of mental unsoundness; yet in an issue of undue influence which is necessarily restrained to the very paper in controversy, the fact of the former will might be excluded as irrelevant. We think in all such cases as this, where the charge of undue influence admittedly requires judicial investigation and the allegation of mental unsoundness is supported by the testimony of the attending physician and other witnesses, it is not wise to restrain the inquiry within the narrow limits of the charge of undue influence alone. Abstaining from further discussion of the facts of this case, we repeat that we think there was enough evidence to take the case to a jury on the question of mental incapacity, and it follows that the decree of the court below must in that respect be reversed.

Now March 13th 1882, it is ordered that so much of the decree of the court below as refused to award an issue to try the question whether James Rea was of sound and disposing mind, memory and understanding at the time of the execution of the alleged will in controversy be reversed, and that the record be remitted, with direction to the court below to award such an issue; the costs of this appeal to be paid by the appellees.