## Lewis Will.

Argued January 3, 1950. Before MAXEY, C. J., DREW, LINN, STERN, PATTERSON, STEARNE and JONES, JJ.

*John W. Bour,* with him *James K. Peck,* for appellants.

*Edward T. Jordan,* for appellee.

Opinion by Mr. Justice Horace Stern, March 20, 1950:

In this case the court below erred in refusing to grant an issue d. v. n.

Decedent, Rose D. Lewis, died at the age of 76 on July 1, 1948. She left surviving, as her only heirs at law, five grandchildren who are the children of her son, Dr. Percival Lewis; the latter predeceased decedent. Her estate consisted of a large building at 1103 Jackson Street, Scranton, worth approximately $25,000, and household furniture valued at $232. By her will she bequeathed the sum of $2,000 each to four of her grandchildren, $1,000 to the remaining grandchild, and $300 to the Watch Tower Society; she devised the Jackson street property to her sister, Carrie C. Bevan, and appointed her to be the executrix of her will. The real estate being thus specifically devised, there were no assets available to pay the legacies.

The will having been admitted by the Register to probate, three adult grandchildren filed their appeal for the award of an issue to determine decedent's testamentary capacity and whether or not her will was procured by undue influence; the court appointed guardians ad litem for the two minor grandchildren and authorized and directed them to join in the appeal. After a hearing before the orphans' court the appeal was dismissed.

Decedent's will was executed by her on her death bed at the West Side Hospital in Scranton on June 30, 1948, which was the day before she died. For many years she had lived by herself and was a severe sufferer from endocarditis, myocarditis, cardio vascular disease, dropsy, and other ailments, for which she was hospitalized in 1945 and again in 1946. Early in 1948 her condition became worse and on May 15 she was removed from her home by stretcher and ambulance and taken to the West Side Hospital where she remained until her death. On June 30 Joseph V. Phillips, Esq. was

summoned by Mrs. Bevan, the proponent, to come to the hospital for the purpose of drawing a will for decedent. Mr. Phillips prepared the will in his own handwriting; in the room at the time, in addition to decedent and Mr. Phillips, were Mrs. Bevan and one Marie Leitner, 79 years of age, who was a lifelong friend of decedent; Mrs. Leitner lived in an apartment in the same building as that in which decedent lived, and had assisted her with her housework over a long period of time.

What was the testimony presented by the contestants in support of their allegation of testamentary incapacity? Dr. Cecil R. Park, who had been decedent's attending physician for nearly three years prior to her death, testified that her heart condition caused dropsy the result of which was that her legs and abdomen were swollen to half again or even twice their normal size; that on June 29 she took a decided turn for the worse; that she was mentally confused; that her speech was incoherent and it was difficult for any one to understand her; that on June 30, the day the will was executed, she was in a semi-comatose or stuporous state; that she was unable to recognize him; that, in his opinion, her poor circulation had caused edema of the tissues of the brain; that—likewise in his opinion—her condition was such that she could not know the extent of her property, recognize the objects of her bounty, nor realize what she was doing sufficiently to make a will; that she could not reason or think well and was not of sound mind. Seven attending nurses, all of whom saw and observed decedent on June 30, substantially confirmed this physician's testimony, as did also an eighth nurse who saw her on the following day, which was the day of her death. They testified in effect that on June 30 her condition was even much worse than on the 29th; that on both those days she was mentally confused, rambled in her speech, was depressed, did not know where she was, and

was unable to recognize them; that her mental condition was such that she was unable to realize what property she owned or who her relatives were, or to make an intelligent disposition of her property; that she was not of sound mind and did not have sufficient mental capacity to make a will. One of these nurses actually saw her within a half hour after the will was executed and for the express purpose of observing her condition. It further appears that both on the 29th and 30th she received hypodermic injections of morphine. The hospital chart for the 30th noted that she was cold and clammy, felt nauseated, and was occasionally quite confused; that her pulse was poor and at times even imperceptible; that she slept for long periods and moaned in her sleep. In addition to the doctor, the eight nurses, and the hospital chart, the contestants produced seven lay witnesses who had known decedent for a long time and visited her at the hospital during the week prior to her death, all of whom testified that she could not talk intelligently and did not recognize them; in their opinion she did not know the extent of her property or the objects of her affection and did not have the mental capacity to make an intelligent disposition of her property. Incidentally, several of these witnesses stated that she had spoken deprecatingly of her sister and had said she was going to leave her estate to her grandchildren.

In view of the number of these witnesses who testified as to decedent's unsoundness of mind and inability to make a will at the time it was executed, together with the fact that they were all disinterested, that the doctor and the nurses, by reason of their professional training, were most competent to observe the condition as to which they testified, and that the evidence they gave was clear and unequivocal, it is difficult to see how any testimony could more strongly support a petition for the granting of an issue d. v. n.

In defense of the validity of the will Mrs. Bevan produced several lay friends of decedent who visited her at the hospital at various times during her final illness and who testified that she talked to them coherently, although some of them admitted that she was occasionally confused; there was testimony also of conversations in which she spoke slightingly of her grandchildren. But the most important evidence presented by Mrs. Bevan was that on June 22 decedent told her that she wanted to make a will and that Mrs. Bevan should get somebody to write it out for her. Accordingly Mrs. Bevan went to the hospital's switchboard operator, one Agatha Mayhew, and brought her that evening to decedent's room, where, in the presence of Mrs. Bevan and Mrs. Leitner, decedent gave Mrs. Mayhew instructions as to the disposition of her property. Mrs. Mayhew testified that she wanted to leave $1,000 to each of four grandchildren, a $2,000 bond to the fifth, and the remainder of her estate to her sister. Mrs. Mayhew wrote out such a paper, decedent signed it, and Mrs. Mayhew and Mrs. Leitner witnessed it; after Mrs. Mayhew departed Mrs. Bevan prepared another paper which decedent signed, making a bequest to Mrs. Leitner of $1,000. Two nights later Mrs. Bevan again sought out Mrs. Mayhew and had her add at the bottom of the original paper a bequest of $200 to the Watch Tower Society. Mrs. Leitner testified that at decedent's suggestion she consulted a bank employe who advised her that they had "better get a lawyer"; she reported this to decedent who told her to ask Mrs. Bevan to procure one. Mrs. Bevan telephoned to Mr. Phillips, who came to decedent's room in the hospital, decedent being propped up in bed, and there, in the presence of the proponent and Mrs. Leitner, he wrote the will now in controversy; he testified that he copied for that purpose the paper previously written by Mrs. Mayhew and handed to him by decedent; the only changes he made were to increase the amount of the

bequest to the Watch Tower Society and to appoint Mrs. Bevan executrix of the will.* Decedent signed the will and Mr. Phillips and Mrs. Leitner subscribed their names as witnesses. Mr. Phillips then prepared another paper making a gift of $1,000 to Mrs. Leitner; decedent signed this also and Mr. Phillips added his name as a witness. In another part of his testimony Mr. Phillips stated that decedent had Mrs. Mayhew's original paper in her hand and read it to him, each paragraph separately, and, as he wrote the will, he read each paragraph back to her; he himself also read the paper and compared it with the will; he testified that decedent put on her eyeglasses and read the will before she signed it; after he had finished with the paper Mrs. Mayhew had prepared he handed it to decedent who tore it in pieces which he then threw in the waste basket. By this evidence the proponent seeks to show that when decedent executed the will on June 30 she was merely confirming, with slight changes, the disposition of her property which she had previously made in the paper signed by her on June 22. While this testimony is entitled, of course, to careful consideration, it does not overcome the testimony presented by the contestants as to the physical and mental condition of decedent on June 30 at the time she executed the will; it is her mental capacity at *that* time which constitutes the question that the trial of an issue d.v.n. must determine: *Dichter Will*, 354 Pa. 444, 449, 47 A. 2d 691, 693.

The learned court stated that it dismissed the appeal of the contestants because "In the opinion of this court, the testatrix, Rose D. Lewis, was not under undue influence and did not lack testamentary capacity when

---

* If Mrs. Mayhew's testimony in regard to the contents of the paper which she prepared is accurate Mr. Phillips must have made some changes also in the amounts of the bequests to the grandchildren.

the will under attack was prepared and executed."
The court's "opinion", thus expressed, was wholly ir-
relevant. The rule is firmly established that the judge
of the orphans' court conducting the hearing on an
appeal for the granting of an issue d.v.n. is not to con-
stitute himself the jury, that is, to decide the case as
he would if acting in the capacity of an ultimate fact-
finding tribunal; his function is to determine whether
there is a substantial dispute upon a material matter of
fact, and such a dispute exists if a verdict that might
be reached by a jury, *even if at variance with his own
opinion,* would not have to be set aside as judicially
untenable because contrary to the weight of the evidence:
*De Laurentiis's Estate,* 323 Pa. 70, 79, 186 A. 359, 363;
*Lare Will,* 352 Pa. 323, 330, 42 A. 2d 801, 804; *Patti's
Estate,* 133 Pa. Superior Ct. 81, 83, 1 A. 2d 791, 793.
A decedent possesses testamentary capacity only if he
has a full and intelligent knowledge of the act in which
he is engaged and of the property he posseses, together
with an intelligent perception and understanding of
the disposition he wishes to make of his property and
of the persons and objects he desires to participate in
his bounty: *Ash Will,* 351 Pa. 317, 321, 322, 41 A. 2d
620, 622; *Dugacki Will,* 356 Pa. 143, 148, 149, 51 A. 2d
627, 630; *Patti's Estate,* 133 Pa. Superior Ct. 81, 90, 91,
1 A. 2d 791, 796. The present record clearly discloses
a substantial dispute as to whether the mental capacity
of Mrs. Lewis, at the time she executed her will, mea-
sured up to that standard; therefore a jury must pass
upon that controverted fact and it was not for the
court itself to attempt to decide it.

We come to the question of undue influence. It
appears that Mrs. Bevan took physical care of decedent
for a period of three weeks before she went to the
hospital and from then on visited her almost every day,
during which time she managed decedent's business
affairs, collected and deposited rents, drew checks and

paid bills. In 1946 her name had been added to decedent's savings account so that she could draw therefrom at will, and in May of 1948 her name was similarly added to decedent's checking account. She herself testified that decedent relied on her "completely in a business way". Some time before 1946 decedent's safe deposit box at the bank had been placed in their joint names, thereby giving the proponent free access thereto. As already stated, she was with decedent when the paper of June 22 and the will of June 30 were executed. On June 29, a day when, according to all the testimony, decedent was in an extremely precarious and even dying condition, Mrs. Bevan wrote to decedent's favorite grandson that "your grandma is feeling pretty good and expects to leave the hospital the latter part of this week; doctor said she getting along fine," which gives rise to a justified suspicion that such an obvious misrepresentation of the truth was for the purpose of keeping the grandson from coming to the hospital to see decedent; curiously enough, decedent, in January, 1948 had written to this grandson criticizing Mrs. Bevan and stating that "if anything happen to me you come at once so you will be here when she opens the box in the bank," to which she added: "I'm telling this because I know how things are, and it is for your own good." This record clearly indicates that there existed a confidential relationship between decedent and proponent which places upon the latter the burden of disproving undue influence, and the cases are legion to the effect that, even though a person be of testamentary capacity, if he is so physically infirm or mentally weak as to be susceptible to undue influence, and a substantial part of his estate is left to one occupying a confidential relation to him, the burden is upon the latter to show that no improper influence controlled the making of the will: *Phillips' Estate*, 244 Pa. 35, 43, 44, 90 A. 457, 460, 461; *Dible's Estate*, 316 Pa. 553, 555, 175 A. 538, 539;

*Schwartz's Estate,* 340 Pa. 170, 173, 16 A. 2d 374, 375; *Hollinger Will,* 351 Pa. 364, 367, 41 A. 2d 554, 555. It is also true that circumstances sometimes exist, as in the present case, where undue influence and mental incapacity are so closely interwoven that it is difficult to separate them in conducting a judicial inquiry, and in such event both of those questions must be included in the issue submitted to the jury: *Wilson's Appeal,* 99 Pa. 545, 551; *Lawrence's Estate,* 286 Pa. 58, 66, 132 A. 786, 789; *Hughes's Estate,* 286 Pa. 466, 472, 133 A. 645, 647.

The order of the court below is reversed, and the record is remanded with direction to grant the issue d.v.n. as prayed for. Costs to abide the event.