Skrtic Will.

Argued September 29, 1954. Before STERN, C. J., STEARNE, JONES, CHIDSEY, MUSMANNO and ARNOLD, JJ.

*Edward J. McGinness,* with him *Walter L. Riggs,* for appellants.

*Fred C. Houston, Jr.,* with him *Houston & Houston,* for appellees.

OPINION BY MR. CHIEF JUSTICE HORACE STERN, November 8, 1954:

Following the filing of a caveat, a writing dated March 16, 1950, signed by mark and subscribed by three witnesses, was offered for probate as the will of the decedent, Toma Skrtic. A hearing was held by the Deputy Register of Wills who refused the application for admission of the alleged testamentary paper to probate. The proponents of the will appealed to the Orphans' Court where, a jury trial having been waived (Act of August 10, 1951, P. L. 1163, Section 745(c)), and considerable testimony having been taken in a hearing de novo before Judge BOYLE, he dismissed the appeal in a decree which was affirmed by the court en banc. The proponents now appeal to this court.

The alleged testator, a native of Croatia, a retired millworker who resided in the Borough of Port Vue, Allegheny County, owned, together with his wife as tenants by the entireties, two adjoining houses and lots valued at $8,000 and $5,000 respectively. These properties constituted practically his entire estate. He and his wife occupied one of the houses in which lived also his daughter, Mrs. Shuster, her husband and their son; in the adjoining house lived his son, Paul G. Skrtic, with his wife and children. Mrs. Shuster and Paul Skrtic are the proponents of the alleged will. Decedent had two other daughters, both married,— Mrs. Muselin and Mrs. Belan,—who live in Beaver County and are the contestants in these proceedings.

In October, 1949, decedent began to suffer from a carcinoma of the prostate which gradually metastasized and spread into the lung. His condition steadily deteriorated and in December of that year he was hospitalized for about two weeks. After returning home he became and remained bedfast until his death on March 17, 1950. His pains grew so agonizing as actually to cause him to grind his teeth down to the gums, and the attending physician, a Dr. Cambotti, prescribed larger and larger doses of a powerful narcotic which Mrs. Shuster administered to him, sometimes at intervals of only three or four hours or even oftener if necessary to allay his intolerable suffering. Toward the latter stage of his illness he became extremely weak, indeed entirely helpless and practically immovable in bed; he was fed only with difficulty and he required attention in the performance of all of his bodily functions. Only in the short intervals between the effects of the drugs was he able to open his eyes and hear and respond to conversation.

Unexpectedly and suddenly decedent's wife died of a heart attack in the early evening of March 12, five days before his own death. Mrs. Shuster immediately called Doctor Cambotti who, after pronouncing Mrs. Skrtic dead, went into decedent's bedroom; there Mrs. Shuster asked him for a certificate that her father was of sound mind; according to her own testimony, this was before her father told her that he wanted to make a will. The doctor thereupon asked decedent his name, the day of the week, and whether he recognized him and Mrs. Shuster; the latter translated these questions into Croatian and reported to the doctor that her father's answers were properly responsive, whereupon Dr. Cambotti gave her a certificate that Skrtic was "of sound and sane mind

—well orientated and able to conduct all business affairs." The doctor had not questioned decedent in regard to his property, his relatives, his business affairs, or his testamentary intentions. Mrs. Shuster and her husband and Paul Skrtic and his wife then drafted, as best they could, and within 15 to 45 minutes of Mrs. Skrtic's death, a proposed will in which decedent left to Paul the house in which Paul was living and to Mrs. Shuster the house in which she and decedent were living, while to his daughters Mrs. Belan and Mrs. Muselin he bequeathed "the sum of one dollar each." According to proponents' testimony decedent signed this will by mark and two witnesses subscribed their names, but, since it had not been made with an attorney present, proponents said that decedent "thought" or "felt" that it might not be legal; there is no testimony that decedent expressed such a doubt to anyone and it is perhaps more likely that it was proponents and their respective spouses themselves who were fearful that the will may not have been prepared in proper form. At any rate, on the morning of March 16th, Dr. Cambotti again visited decedent, and, at Mrs. Shuster's request, again gave her a certificate similar to the one of March 12th, stating that decedent was "of sound and sane mind—well orientated in his surroundings and persons." Mrs. Shuster testified that she had not given her father any opiate either the night before or that morning, but, after Dr. Cambotti left, she administered a dose of the drug at 12 o'clock noon. She said that decedent asked her to call a certain real estate agent with whom he had had business dealings; she did so and, in the afternoon, this real estate dealer came with a lawyer. The lawyer testified that they found decedent asleep, and although they spoke loudly to him several times he made no reply; accordingly, he did

not think it was a proper time to have decedent make a will. Thereupon Mrs. Shuster, her husband, Paul Skrtic and his wife, conferred with him and told him what property the decedent had and "what their ideas—or what his idea as conveyed to them was as to the making of a will." Among those "ideas" was a statement for insertion in the will of an alleged reason why decedent was disinheriting his two older daughters, namely, that both of them had already received their shares of his estate. Apparently in order to "make assurance doubly sure"[1] proponents directed him to prepare deeds providing for the conveyance of the two properties, the one to Mrs. Shuster and the other to Paul.[2] The lawyer returned to his office and prepared the draft of a will similar in substance to the one proponents had written on March 12th but phrased, of course, in more legalistic language; he also prepared the two deeds. These instruments were all picked up by Paul and at about 5:30 o'clock in the afternoon Mr. and Mrs. Shuster, Paul and his wife, and three other persons—a Mr. Gojak and a Mr. Pribonic, who had long been acquainted with decedent, and a Mrs. Joyce, a notary public—went to the bedroom of the decedent. Their testimony was, in general, to the effect that he was awake, that the will was read aloud to him in English by Paul and then translated into Croatian by Gojak, and after the reading and translation of each paragraph he nodded his assent thereto by moving his head up and down. They further testified that, upon its being suggested to him that Mrs. Joyce sign

---

[1] Macbeth, Act IV, Scene 1.

[2] On March 13 a change of beneficiaries from decedent's wife to Mrs. Shuster and Paul Skrtic had also been effected on a policy of insurance held by decedent in a Croatian Fraternal Union, the signature being by mark.

his name to the writing, he agreed by nodding his head; then decedent made his mark by touching the pen which was held by Gojak although the extent to which he really participated in the making of the mark is not clear. It is this alleged will of March 16th that proponents offered for probate. There is nothing in the testimony regarding the circumstances under which decedent, on the same occasion, made his mark to the two deeds. He died on the following day.

While it is true that the subscribing witnesses all testified that decedent was of sound mind when he executed the will and knew what he was doing, the court below stated in its opinion that this conclusion "had necessarily to be drawn from the decedent's appearance and the attending circumstances because the uncontroverted testimony is that the decedent did not speak a word during the execution of the writing." In this connection it is important to note that Dr. Cambotti testified that *when decedent was free from the effect of the drugs he was able to talk very clearly and did talk at such times, from which it would inevitably appear that if he was unable, as admittedly he was, to talk at all at the time of the alleged execution of the will, he was not free from the influence of the drugs but, on the contrary, was in a stuporous condition.*

The test of capacity to execute a will is whether the testator appreciates, in a general way, who his relatives are and what property he possesses, and indicates an intelligent understanding of the disposition he desires to make of it.: *Olshefski's Estate*, 337 Pa. 420, 423, 11 A. 2d 487, 488. While evidence of incapacity near the date of the will is admissible, the capacity to make a will is to be determined by the testator's condition at the very time of its execution: *Dichter Will*, 354 Pa. 444, 448, 449, 47 A. 2d 691, 693;

*Lewis Will*, 364 Pa. 225, 231, 72 A. 2d 80, 84; *Williams v. McCarroll*, 374 Pa. 281, 293, 97 A. 2d 14, 19, 20. The evidence in the present case not only fails to establish that the decedent had testamentary capacity at the time when the alleged will was executed, but, on the contrary, clearly indicates that such capacity was utterly lacking. The picture presented by the testimony is one of an agonized sufferer from the ravages of a cancer which had almost reached its inevitable end, a helpless physical wreck of a man dosed with continually increased amounts of a powerful opiate administered to him at shorter and shorter intervals. As far as the actual execution of the will is concerned, Mrs. Joyce, who was apparently the most disinterested and most objective in her testimony, testified that "Mr. Gojak took the pen, and *he placed it*—and then Mr. Skrtic's hand *sort of* grasped the pen a little bit, and they seemed to make the 'x' together. Now, I wasn't near enough to know *who was making the 'x'*, but it *seemed* both of them made it together." And when to this picture we add the further facts, already stated, as to the way in which the writing of March 12th had been prepared, the time at which and the manner in which it was executed, the obtaining of the certificates from Dr. Cambotti, his testimony that if decedent were not under the effects of the drug he would be able to articulate, the procuring of the execution of the deeds, the fact that it was only the proponents and not the decedent himself who told the scrivener what the terms of the will were to be, the questionable interpretation by the witnesses of the alleged nodding of decedent's head as indicating his assent, and, finally, the fact that the will gave the only properties possessed by him to Mrs. Shuster and Paul and disinherited his other two daughters,—all these circumstances fully justify the

decision of the court below that the alleged will was not a valid instrument which should be admitted to probate. It may be added that the statement inserted in the will that Mrs. Muselin and Mrs. Belan had already received their shares of decedent's estate was explained by Mrs. Shuster as being based merely upon the fact that decedent had given to Mrs. Belan the sum of $500 when she married in 1921, and had raised an infant child of Mrs. Muselin during a period of 9 years some 20 years before.

The hearing judge held that a confidential relationship existed between Mrs. Shuster and her father, pointing out that Mrs. Shuster herself testified that she took care of all of her father's business, that he had implicit confidence in her, and that, both before he became sick and after, she had managed his affairs from the time she was 21 years of age. Moreover, decedent was absolutely dependent upon her for assistance in the exercise of his most elementary bodily functions and for the administration of the opiate to assuage his constantly increasing pains. The court stated that "This relationship, together with the established fact of the decedent's advanced state of physical and mental weakness at the time of the execution of the alleged will and his inability to make articulate his wishes as to the disposition of his property, was sufficient in law to shift the burden to the proponents of proving by positive evidence that the decedent possessed testamentary capacity and that the procurement and execution of the writing were free from the exercise of undue influence: . . . . This burden was not met by the proponents." It has been held in a long line of cases that even if a person has testamentary capacity, but is so weak physically or mentally as to be susceptible to undue influence, and a substantial part of his estate is left to one occupy-

ing a confidential relation to him, the burden is upon the latter to show that no improper influence controlled the making of the will: *Phillips' Estate*, 244 Pa. 35, 43, 44, 90 A. 457, 460, 461; *Schwartz's Estate*, 340 Pa. 170, 173, 16 A. 2d 374, 375; *Lewis Will*, 364 Pa. 225, 233, 234, 72 A. 2d 80, 85; *Wilson Will*, 364 Pa. 488, 493, 72 A. 2d 561, 563; *Snedeker Estate*, 368 Pa. 607, 612, 84 A. 2d 568, 571. However, even if this were otherwise, and the burden of proof was upon the contestants, that burden would have been fully met by the testimony of the proponents themselves and their witnesses.

Decree affirmed at the cost of proponents.