**Campo Estate**

2

The facts appear from the following extracts from the adjudication of

SAYLOR, J., Auditing Judge, June 30, 1960.—James Campo, also known as James A. Campo, owner and operator of a pig farm in New Jersey and of an abattoir and butcher shop in Philadelphia, died April 22, 1959, at age 60. On April 20, 1959, he executed a document which was probated as his last will on April 23, 1959. Thereby, he bequeathed $45,000 to the 10 children of his Aunt Rose Tenuto and the remainder of his substantial estate to his wife and four children. Letters testamentary were issued to Abraham J. Levy, Esq., and Joseph J. Molinari.

On September 1, 1959, the four children appealed from the probate, alleging lack of testamentary capacity and undue influence. Under the disputed will, their mother receives one-third and they receive two-thirds of the residuary estate, each of two daughters receiving 13 1/3 percent and each of two sons receiving 20 percent. The burden of their complaint is that their father's alleged will is not a natural one as he had no reason for making bequests to first cousins or for naming executors outside the family and, furthermore, that these executors and Fred Tenuto, a first cousin, had exercised undue influence upon decedent who was in such a physical condition that he could not make a will. . . .

## I. Execution of the Will

The hearing judge believes the testimony of Messrs. Levy and Molinari. He finds as a fact that decedent gave instructions for writing his will as testified to by the scrivener, and that he (the scrivener) faithfully carried out such instructions; that the will as drafted was read aloud to Campo by the scrivener; that testator and the subscribing witnesses signed the same in the presence of each other on April 20, 1959.

The testimony of contestants' witnesses as to the facts attendant upon the execution of the alleged will is not sufficiently strong to overcome that of the attorney who drew the will and of the other subscribing witness: Conway Will, 366 Pa. 641 (1951); Higbee Will, 365 Pa. 381 (1950).

## II. Claim of Undue Influence

There is no evidence that Fred Tenuto or any party other than the scrivener had anything to do with either the preparation or the execution of the will, or that Tenuto or any other party brought to bear influence of any kind upon the testator or the scrivener at any time prior to or after Campo's admission to the hospital. Fred Tenuto never discussed the subject of a will with Levy or Molinari either before or after the preparation. He never discussed with Campo any disposition of his estate. . . .

There was no imprisonment of the body or mind of the testator by Fred Tenuto or anyone else. There was no fraud, no threats or misrepresentations or other circumstances of flattery or coercion to such a degree as to prejudice Campo's mind. Where the testator is of strong mind, evidence of influence must be clear, direct and convincing: Thompson Will, 387 Pa. 82 (1956). There is no such evidence here. Nor is there any evidence of a weakened mind such as would shift the burden of proof: Roberts Will, 373 Pa. 7 (1953); Phillips' Estate, 244 Pa. 35 (1914). Nor is there any beneficiary under the will who was a confidential advisor to decedent: Adams' Estate, 220 Pa. 531 (1958). . . .

## III. Claim of Testamentary Incapacity

The testimony of the two physicians who actually attended decedent before and throughout his final illness outweighs in value that of an expert who neither saw nor examined the patient and never prescribed

any treatment for him. The testimony of Dr. Digilio is of little weight against the factual evidence of the attending physicians and of several disinterested witnesses who knew the testator: Conway Will, supra; Cookson's Estate, 325 Pa. 81 (1937).

Such physical disability as Campo suffered did not exist to the degree that it deprived him of any comprehension of the act he was performing when he signed the papers prepared for him at his request by his friend and attorney of many years' standing. Neither age, nor sickness, nor extreme distress, nor debility of body will affect the capacity to make a will if sufficient intelligence remains: Conway Will, supra; Lawrence's Estate, 286 Pa. 58 (1926). . . .

The testimony of the scrivener, the subscribing witnesses and the attending physicians is entitled to great weight: Masciantonio Will, 392 Pa. 362 (1958). Their testimony and that of other witnesses who conversed with decedent at or about the time the will was written and executed supports the proponents' position that Campo was able to make a will. His body was frail but his mind was functioning. He died of a heart attack and cirrhosis of the liver.

After giving thorough consideration to the testimony as a whole, and in particular that concerning decedent's physical and mental condition, the hearing judge finds as a fact that James Campo was informed concerning the general nature of his estate, knew the natural objects of his bounty, was aware of what he was doing, and, in short, had testamentary capacity when on April 20, 1959, he executed the document that was probated as his last will.

### IV. Claim that the Will is Unnatural
#### (a) The Tenuto Bequests

The four children, who are the sole contestants, here contend that the alleged will provides an un-

natural disposition of their father's estate and one that is contrary to his known intentions, feelings and desires. Their attack on any bequest to the cousins is blunted by Anna Mae Casiello's statement that her father thought a great deal of Aunt Rose, their mother and Mary Jane's statement that he should have left money to her before leaving it to her children. Aunt Rose, on the other hand, testified that she wanted nothing although she was disappointed that her nephew had not given more to her two sons, Fred and Clement. . . .

The Tenuto brothers had over the years placed their financially successful cousin in their debt and very properly he made provision for them in his will. The argument of the contestants that their father would never sell the farm is not impressive in view of the testimony and the provision in the will. The brothers and sisters of Fred and Clement were not at all unnatural recipients of the bounty of Campo who looked on "Aunt Rose" as a mother.

### (b) . Appointment of executors

The contestants make much of the appointment of strangers to the family as executors as another indication that the probated will is not a natural will. That decedent elected to name as executors mature men of long experience whom he knew and trusted over a period of nearly 40 years instead of immature sons is entirely understandable. It evidences the good sense of a self-made man who had a considerable estate to be administered. . . .

It would appear that if only the widow and the four children were to have been named as legatees or executors, or both, there would have been no action to set aside the will. As it is, the family would deny the testator the right to make one, and would impose their ideas and desires upon him and write for him such a

will as to them, and not to him, would seem proper and fitting.

The hearing judge finds as a fact that the probated will is a natural one. Whether decedent's estate have a gross value of $482,000, or of $200,000 less than that as contended due to the alleged over-appraisal of real estate, there is nothing unusual or unnatural about decedent's setting aside $45,000 for his first cousins before bequeathing the entire residuary estate to his widow and four children. This is not a case where a stranger to the blood receives the inheritance.

### V. Conclusion

The contestants have failed to prove to the satisfaction of the hearing judge that they are entitled to the award of an issue. They have failed to substantiate charges of undue influence and lack of testamentary capacity. They have failed to prove their claim that the will is an unnatural one.

In the foregoing opinion, the hearing judge has made a number of findings of fact. This is not to be taken to mean that he has weighed the credibility of witnesses, appraised the facts and drawn inferences from them, or formed a personal opinion of the disposition to be made. This he has not done because so to do would usurp the province of the jury.

". . . the judge of the orphans' court conducting the hearing is not to constitute himself the jury, that is, to decide the case as he would if acting in the capacity of an ultimate fact-finding tribunal. His function is to decide whether there is a substantial dispute upon a material matter of fact, and such a dispute exists if a verdict that might be reached by a jury, even if at variance with his own opinion, would not have to be set aside as judicially untenable because contrary to the weight of the evidence": DeLaurentiis' Estate, 323 Pa. 70, 79, (1936). See also Lewis Will, 364 Pa. 225 (1950); O'Malley Will, 370 Pa. 281 (1952).

The hearing judge has made his findings of fact solely on the basis that there exists such a weight of evidence in support of his findings that a verdict returned by a jury contrary to such findings could not be permitted to stand and would be set aside as untenable under the evidence considered as a whole. The various findings of fact made by the hearing judge are therefore to be regarded as no more than a statement that there did not exist any substantial dispute of fact with regard to the matter so found and that a verdict of a jury to the contrary would necessarily be set aside as untenable.

The hearing judge's conclusion that there is no substantial dispute of fact is not based upon his own opinion as to what the evidence establishes or upon any conclusion such as would be reached by the ultimate trier of fact. Compare Lare Will, 352 Pa. 323, 332 (1945).

The hearing judge finds that no substantial dispute exists as to any issue raised by the contestants, and that in good conscience he could not permit to stand a verdict of a jury setting aside the will of James Campo, for such a verdict would be judicially untenable because contrary to the weight of the evidence: Higbee Will, supra; Conway Will, supra.

Accordingly, the prayer of the petition is denied, an issue devisavit vel non is refused and the record is remanded to the Register of Wills.

*Albert H. Gold* and *Bernard J. Korman,* for exceptants.

*Samuel Dash, Thomas F. Wilson, Pershing N. Calabro* and *Joseph D. Burke,* contra.

### Opinion sur Exceptions

LEFEVER, J., November 7, 1960.—This case is before the court on exceptions to the action of the hearing judge in refusing to award a jury trial and

in dismissing the appeal from the register in a will contest grounded upon lack of testamentary capacity and undue influence.

We have carefully reviewed the exceedingly voluminous record in this case. The learned hearing judge, with full measure of patience, gave contestants complete opportunity to present their case. Some evidence was introduced which, standing by itself, might give some indication that testator did not have requisite testamentary capacity at the time he executed his will. However, the overwhelming weight of the evidence establishes beyond reasonable doubt that although testator was then a very sick man physically, his mind was clear, he had full knowledge of what he was doing, he had testamentary intent, and no undue influence was exercised upon him. Consequently, we all agree with the hearing judge's decision not to award a jury trial and to dismiss the appeal upon the record.

The learned hearing judge has analyzed the evidence and applied the law with care and accuracy. However, we wish to emphasize several important aspects of this case which impel us to our conclusion.

## 1. *The Will Was Drawn by a Lawyer*

This will was written by an experienced lawyer who bears a fine reputation at the bar and is highly regarded by this court. He had been testator's lawyer for 35 years. During this time he had handled a number of miscellaneous legal matters for testator and on several previous occasions, testator had discussed generally with him the drafting of his will. He was generally informed about testator's affairs. He was personally acquainted with testator's immediate family and relatives and he "knew the entire background of the family." In addition he had been a close and trusted friend for 40 years.

He was summoned to the hospital by testator on Monday, April 20, 1959, the day after testator's admission to the hospital in his terminal illness. The message was delivered by another intimate friend of testator, Magistrate Joseph N. Molinari. Several of testator's relatives and friends were present when the scrivener arrived at the hospital at 2 p.m. At his request they left the room. The scrivener discussed testator's testamentary wishes with him; departed from the room to an outside corridor; wrote the will in longhand; returned to the hospital room; sat beside testator on his bed, holding the document about 14 inches from testator's face and read the will aloud to testator. As he did so, testator followed the writing with his eyes, repeatedly nodding affirmatively and voicing approval. When scrivener finished reading the document, testator exclaimed: "That is exactly what I want. That is my will! Where do I sign it?" The scrivener showed him. Thereupon, testator, who "was sitting up in bed", signed the two-page will in a firm, clear hand at the end thereof and also along the margin of the first page. Thereupon, he turned to the scrivener and Molinari and said: "That is my will. Will you two fellows sign as witnesses?" The scrivener and Molinari then complied with his request in his presence.

There was some evidence produced which indicated that the scrivener did not read the will to testator before the latter executed it. However, there was ample, competent, credible evidence to warrant the conclusion reached by the learned hearing judge that the will was read to testator before its execution.

It is well settled that a will prepared by a lawyer is entitled to great weight: Williams v. McCarroll, 374 Pa. 281, 292; Gorsuch Estate (No. 2), 8 D. & C. 2d 325, 328. The instant case is no exception. The

scrivener was not related to testator and had no personal interest in the will, or in any of testator's relatives, or in the beneficiaries therein named. His testimony was forthright and credible. He and Molinari were unequivocal in their testimony that testator, a strong-minded man, knew exactly what he was doing when he instructed the scrivener as to his testamentary desires and when he signed his will.

## 2. *This Is a Natural Will*

This will gives a total of $45,000 in legacies to the children of testator's aunt, Rose Tenuto. Testator held her in affectionate esteem. Two of her children, who received the largest legacies, were trusted, loyal and devoted employes of testator, and for many years had worked zealously, faithfully and indefatigably for him at very modest wages. In the office of his business to which these legatees had constant access, testator built a special safe wherein he kept large sums of cash, at the time of his death there was $64,000 in small bills lodged therein. One of these cousins, Fred Tenuto, took testator to the hospital on April 19, 1959, when he was stricken with his fatal illness. To him, not to immediate members of his family, testator entrusted the deposit of $235 in cash which testator carried on his person.

The residue of his estate, inventoried at $428,000, was given one third to testator's widow and two thirds to testator's sons and daughters.

Testator named his trusted lawyer, close friend, scrivener and subscribing witness, Abraham J. Levy, Esq., and his most intimate friend and the second subscribing witness to the will, Joseph J. Molinari, as his executors.

It is normal for a testator to give specific legacies to relatives other than immediate family, especially when the estate is large and the legatees are also close

friends and valued, loyal, long-standing employes. This is particularly so when, as here, the bulk of testator's estate was given to his wife and children. Moreover, there is nothing suspicious or unusual in a testator designating as his executors a lawyer and an elected public official rather than members of his family.

A heavy burden rests upon contestants who strive to set aside a natural will. The testimony discloses that testator's widow and children harbor bitter animosity against the specific legatees and that they are grievously disappointed because testator did not select them to serve as executors of his will. But they have failed signally to meet the burden of proof resting upon them.

### 3. *The Medical Testimony is Conclusive*

Two attending physicians saw testator several hours after the execution of his will. One of them made four professional calls upon him within hours of the execution of the will, two before and two after. Both doctors testified unequivocally that testator's mind was clear, that he knew what he was doing, that he spoke intelligibly, that he comprehended what they said and that he had the mental capacity to make a will.

The first of these physicians was Dr. Sindoni. He is a specialist in diabetes; chief of metabolism (diabetes) at Philadelphia General Hospital for 25 years, also at St. Joseph's Hospital; director of the Sindoni Clinic, which is staffed by specialists in all fields of medicine; connected with the University of Pennsylvania and Temple University Medical Schools, and author of well-known medical treatises. He was testator's physician for years. Testator was admitted to St. Joseph's Hospital on Dr. Sindoni's service for his fatal illness, as well as on previous occasions. Dr.

Sindoni saw testator at 5 p.m., and at midnight on the day before the execution of the will, and at 6 p.m. and at midnight upon the date of execution. He found testator rational and apologetic for failing to follow his medical orders. Testator gave Dr. Sindoni a clear history of his current condition. Testator was so lucid that several hours before the will was drawn, Dr. Sindoni advised Molinari, in answer to the latter's telephonic inquiry, that testator "was in condition to make a will."

Dr. Frank A. Bove has been Dr. Sindoni's assistant for 10 years. He is a specialist in diabetes and is board-certified in internal medicine. He joined Dr. Sindoni in administering to testator during his fatal illness and his prior hospitalizations. He and Dr. Sindoni together called upon testator about 6 p.m. April 20, 1959. Dr. Bove testified that testator was clear and rational and had testamentary capacity at that time.

In contrast, Dr. Victor A. Digilio testified that testator did not have testamentary capacity. Although Dr. Digilio appears to be a competent specialist in internal medicine and cardiology, he never examined or saw testator. He was the cardiologist of St. Joseph's Hospital. As such, he examined the electrocardiogram which was prescribed for testator immediately after his admission to the hospital for his fatal illness. Dr. Digilio also examined the hospital records covering testator's hospitalization for his fatal illness and his earlier hospitalization when he was suffering from an apoplectic stroke. Relying upon the cardiogram, the hospital records during testator's three stays in the hospital, and many assumed facts contained in a long, detailed hypothetical question propounded by contestants' attorney, Dr. Digilio expressed the opinion that testator lacked testamentary

capacity at the time he signed his will. However, this question included many assumed facts as to which the evidence was controversial, and some of which evidence the hearing judge did not believe. This in itself casts grave doubt upon Dr. Digilio's answer.

The courts have made a clear distinction between the weight to be accorded the testimony of a physician, based upon his personal examination and observation of a patient, as contrasted with that of a physician who testifies as an expert relying, not upon personal examination or observation of the patient, but upon hospital records, X-rays, electro-cardiograms, laboratory tests, etc., or one who testifies solely in answer to hypothetical questions. The opinion testimony of the most respected and outstanding physicians and surgeons, who have not personally examined or observed the patient, has been given little weight by the Supreme Court and by this court: Conway Will, 366 Pa. 641, 644; Masciantonio Will, 392 Pa. 362, 384, and Gorsuch Estate (No. 2), 8 D. & C. 2d 325, 327.

In contrast, the testimony of physicians who have personally examined and observed the patient is entitled to great weight. Conway Will, supra. See Cookson's Estate, 325 Pa. 81, 88.

We unanimously agree with the conclusion of the learned hearing judge, that the positive testimony of Dr. Sindoni and Dr. Bove far outweighs the negative testimony of Dr. Digilio. Certain of Dr. Sindoni's testimony, standing alone and out of context, seems incredible. However, he was goaded into these statements by needlessly repetitious and painfully long cross-examination, which finally drove him to the point of exasperation. His testimony in essence was that testator knew what he was doing and what he wanted and was lucid in communication and comprehensive of

ideas. Moreover, Dr. Sindoni diagnosed and prescribed upon his clinical knowledge, his personal observation of testator in the hospital during his fatal illness, and his observation and treatment of testator over many years. He disregarded reports of nurses and interns and laboratory and other tests which did not conform to his findings from personal observation and treatment. Finally, Dr. Sindoni was unequivocal that testator was lucid and comprehending and was not in critical condition physically until late afternoon of April 21, 1959, when his heart rapidly failed with all the concomitant usual symptoms. The death certificate specifies acute heart failure and cirrhosis of the liver as the cause of death.

The medical testimony establishes testator's testamentary capacity at or about 3 p.m., April 20, 1959, and corroborates the testimony of the scrivener and the other subscribing witness. As stated in Williams v. McCarroll, 374 Pa. 281, 293 ". . . where a will is drawn by decedent's attorney and proved by subscribing witnesses, the burden of proving lack of testamentary capacity or undue influence 'can be sustained only by clear and strong or compelling evidence'; and this is especially so if proponents were corroborated by the attending physician: *Higbee Will*, 365 Pa. 381, 382, 75 A. 2d 599; *Franz Will*, 368 Pa. 618; *Sturgeon Will*, 357 Pa. 75; *Ross Will*, 355 Pa. 112, 49 A. 2d 392; *King Will*, 369 Pa. 523, 87 A. 2d 469; *DeMaio Will*, 363 Pa. 559, 70 A. 2d 339."

This was quoted with approval in Thompson Will, 387 Pa. 82, 87. Contestants have not produced such "clear and strong or compelling evidence" to contradict the testimony of the scrivener, the subscribing witnesses and the attending physicians in this case.

4. *The Effect of the Hearing Judge's Decision*

A jury trial in a will contest will be awarded only where there is a substantial dispute as to a material

fact: Section 745(a) of the Orphans' Court Act of August 10, 1951, P. L. 1163, 20 PS §2080.745, as amended.

". . . The rule is firmly established that the judge of the orphans' court conducting the hearing on an appeal for the granting of an issue d.v.n. is not to constitute himself the jury, that is, to decide the case as he would if acting in the capacity of an ultimate fact-finding tribunal; his function is to determine whether there is a substantial dispute upon a material matter of fact . . .": Lewis Estate, 364 Pa. 225, 232; Molden Will, 387 Pa. 484, 501; Kerr v. O'Donovan, 389 Pa. 614, 621.

However, in determining whether such a dispute exists, the hearing judge is not bound to believe the testimony of witnesses he finds to be untruthful, unreliable, inconsistent, disreputable or self-interested. A conflict between the testimony of such witnesses and other witnesses, whom the hearing judge considers truthful, convincing and credible, does not constitute the requisite dispute. Likewise, a conflict in testimony between the attending physicians who examined and observed the testator at or about the time of the execution of the will and the opinion testimony of a physician who has not seen the testator and relies solely upon laboratory tests, X-rays, cardiograms, etc., does not constitute such a dispute.

As stated at the outset, some evidence was produced by contestant which would indicate that testator was not only physically, but mentally, incapacitated at the time he executed the questioned will. However, this evidence is fragmentary and unconvincing. It is far outweighed by extensive credible evidence to the contrary. Furthermore, there is not a scintilla of evidence of undue influence.

The determination by the hearing judge, who heard and observed all of the witnesses, on the existence or

nonexistence of a substantial dispute as to a material fact, is entitled to great weight and will not lightly be set aside by this court.

"In resolving this question [whether a substantial dispute as to a material fact exists] we apply the following test or criterion: if this issue of fact were submitted to a jury and the jury returned a verdict either for proponent or for contestant, would either verdict have to be set aside because it was contrary to the weight of the evidence? If after an analysis of the entire evidence as a whole, we answer this question in the negative, then the dispute is substantial; if the answer is in the affirmative, then the dispute is not substantial": Kerr v. O'Donovan, 389 Pa. 614, 620. We unanimously agree with the decision of the learned hearing judge documented by cogent reasons in his able and exhaustive opinion, that the answer to the above quoted test is in the affirmative and that if a jury trial had been awarded and the jury had rendered a verdict striking down the will, the court would have been compelled to set it aside. Accordingly, the learned hearing judge correctly refused to award a jury trial and properly dismissed the appeal.

For all of the foregoing reasons, the exceptions are dismissed.