Gold Will.

Argued April 18, 1962. Before BELL, C. J., MUS-
MANNO, JONES, COHEN, EAGEN and O'BRIEN, JJ.

*M. J. S. Stoney,* with him *George Guyer Young,* for appellants.

*Frank J. Bowden, Sr.,* with him *Charles H. Heidman,* for appellees.

OPINION BY MR. JUSTICE BENJAMIN R. JONES, June 28, 1962:

This appeal challenges the validity of a decree of the Orphans' Court of Delaware County which refused in a will contest to grant an issue d.v.n. on testamentary capacity and undue influence.

Florence A. Gold (decedent), aged eighty-four years, died on January 14, 1960 in Media, Delaware County. Her only surviving relatives were Clifford A. Gold,[1] a brother, Howard W. Gold, Jr., a nephew, and Frances V. Ligambi, a niece, the latter being children of decedent's brother, Howard W. Gold, who predeceased decedent.[2]

Decedent's last will, executed on November 5, 1959, after providing for her burial and payment of her debts, stated: "Third. I make no provision for my brother or the families of my brothers for the reason that in my opinion they unfairly extracted from me the sum of Twenty Thousand Dollars ($20,000) under threat of contesting in court the will of my brother Walter." The will then provided that decedent's residuary estate should be divided into "five equal parts",

---

[1] This brother, a contestant who died January 3, 1961 and whose personal representative has been substituted on this record had not seen his sister since 1949.

[2] This nephew and niece did not know their aunt and their father had not seen his sister since 1949.

that "three of said equal parts" should be given to her "friend and attorney" Cecil P. Harvey, Esq. and the remaining "two parts" to her "friend" Carrie Brown. In so providing, decedent stated: "I make these bequests of my residuary estate for the reason that they are my closest friends and have taken care of me in illness, in health, and who have for many years past responded to my needs whenever called upon." Attorney Harvey was named as the executor.

For an understanding of the third paragraph of this will certain factual background must be noted. In 1943 decedent, Eva Gold (an unmarried sister) and Walter Gold (an unmarried brother) lived together in Llanerch, Pa. Walter Gold had been engaged in business but, due to ill health, for a number of years he was unable to manage his business and the decedent, under a power of attorney, ran the business for him. Eva Gold kept house for Walter Gold and the decedent and Carrie Brown—one of the two residuary legatees—acted as a part-time domestic in the Gold household. Clifford Gold and Howard Gold, decedent's other brothers, were employees in Walter Gold's business. In August 1943 Attorney Harvey drew wills for Walter Gold, Eva Gold and decedent. When Eva Gold died she left her estate equally to Walter Gold and decedent. Thereafter, in June 1949, Walter Gold died leaving a gross estate of approximately $119,000, and, under his will, his estate was given to decedent as the sole surviving legatee, his will specifically excluding Clifford and Howard Gold from taking any portion of the estate. After confirmation of the account in that estate by the Orphans' Court of Delaware County, Clifford Gold and Howard Gold threatened to contest the will and that threatened contest was settled by the payment of $10,000 each to Clifford and Howard Gold by decedent. In letters enclosing these checks to the lawyers for Clifford and Howard Gold, Attorney Harvey

relayed decedent's instructions: "she does not want them to make any attempt to get in touch with her in the future or to have anything to do with her in the future". *On that same day* decedent executed a will which stated, inter alia: "I leave nothing to . . . Howard W. Gold and Clifford A. Gold for the reason they deserve nothing and have today extracted from me money to which they are not entitled in settlement of a contemplated contest of the will of my dear brother, Walter C. Gold". Sometime thereafter Clifford Gold wrote several letters to the decedent which she returned unopened. It is clear beyond any question that decedent at the time of her death was not, and for many years had not been in good terms with either Howard or Clifford Gold and the latters' families were strangers to her.

On January 22, 1960, decedent's surviving brother, her nephew and niece filed a caveat against the probate of the will. Hearings were held before the Register of Wills of Delaware County at which voluminous testimony was presented and on April 19, 1960 the Register admitted the will to probate. From the probate of the will an appeal was taken to the Orphans' Court of Delaware County. Counsel then stipulated that the testimony and exhibits produced before the Register should constitute the record upon which the Orphans' Court should decide whether to grant an issue d.v.n. on the question of testamentary capacity and undue influence. On July 13, 1961, the Orphans' Court of Delaware County upheld the probate of the will and refused to grant an issue d.v.n. on testamentary capacity and undue influence. From that decree this appeal has been taken.

At the outset it must be noted that in the court below and in this Court appellants raised *only* two questions: the lack of testamentary capacity and the presence of undue influence. *The execution of the will*

*by decedent and the validity of such execution are not questioned.*[3]

## Testamentary Capacity

This will was executed on November 5, 1959 and ". . . the testamentary capacity of the [decedent] is to be determined by [her] condition at the very time of execution of the will although evidence of incapacity near the date of execution is admissible as tending to show lack of capacity on that day: Skrtic Will, 379 Pa. 95, 100, 108 A. 2d 750; Williams v. McCarroll, 374 Pa. 281, 293, supra; Higbee Will, 365 Pa. 381, 384, 75 A. 2d 599; Lewis Will, 364 Pa. 225, 231, 72 A. 2d 80 . . .": *Masciantonio Will,* 392 Pa. 362, 384-385, 141 A. 2d 362.

Three witnesses testified as to the circumstances surrounding decedent's testamentary capacity at the time of the execution of the will: the subscribing witnesses, Dr. and Mrs. W. A. Bishop and the scrivener, Attorney Harvey. Dr. Bishop stated that decedent at the time was "very coherent, very rational, very normal", that he was "convinced that she knew what she was doing, she wanted to do this; she understood what she was doing", and that he considered that "Miss Gold was of clear mind". Mrs. Bishop stated that, when she was called into decedent's room as a witness, decedent "seemed very happy, had a contented look", thanked her for signing the paper and, on this and other occasions thereafter when she visited decedent, the decedent appeared "very normal" and their conversations were "very intelligent". Attorney Harvey testified as to the events which took place at the time decedent signed the will and that she had at that time

---

[3] Appellants stress the fact that the attestation clause signed by the subscribing witnesses is at variance with the facts of execution as related by the scrivener and subscribing witnesses. However, due and proper execution of the will is conceded; therefore, the variance is relevant only on the question of credibility of the subscribing witnesses.

the requisite mental capacity to make and execute a will.[4]

Dr. W. E. Wentz, Jr. who was decedent's attending physician from September 30, 1959 until November 4, 1959 when she was discharged from the hospital, when decedent was taken from the Brookwood Retirement Home, Media, to the Crozer Hospital, Chester, and thereafter, from November 4, 1959 until her death on January 14, 1960 in the Bishop Nursing Home, Media, saw decedent twice on November 4, 1959—once at the hospital in the morning and again in the afternoon in the Bishop Home. On November 6, 1959 he saw decedent and, thereafter, he saw her every two or three days and, as she improved, every three or four days at the Bishop Home. Dr. Wentz stated that up until the latter part of December, 1959, decedent's mental condition was "very clear", that she knew him and was able to intelligently converse with him. Particularly significant is this portion of Dr. Wentz's testimony: "Miss Gold's mental condition was quite good, she spoke intelligently at all times; she was a woman of very, very strong opinions, and she expressed herself as to her likes and dislikes very frankly, and in my opinion she was entirely clear mentally, both shortly before and for sometime after November 4th, I would say right up until the final couple days of her life, she was very clear mentally. Q. Did this heart condition and this edema, in your opinion, in any way, affect the mental processes of Miss Gold during the time she was in the

---

[4] For all practical purposes, Attorney Harvey, not Attorney Bowden, was the scrivener of this will. Since Attorney Harvey was benefited in large part by the provisions of the will this circumstance requires that his testimony be carefully scrutinized and not given the same weight ordinarily given the testimony of the scrivener of a will: *Cuthbertson's Appeal*, 97 Pa. 163; *Wilson's Appeal*, 99 Pa. 545; *Yardley v. Cuthbertson*, 108 Pa. 395; *Armor's Estate*, 154 Pa. 517, 26 A. 619; *Llewellyn's Estate*, 296 Pa. 74, 145 A. 810; *Paul Will*, 407 Pa. 30, 180 A. 2d 68[2].

hospital and up until late December of 1959? A. No, it didn't mentally. Q. Is it your opinion then she was at all times competent mentally, during that period? A. Yes."[5] Under Dr. Wentz's testimony it is clear that, even though he did not see decedent on the date the will was executed, in his opinion decedent on that date and until at least the latter part of December, 1959 possessed testamentary capacity and was neither mentally infirm nor weak.

Mrs. DeHaven, a nurse and supervisor at the Bishop Home, who had an opportunity to observe decedent from November 4, 1959 until her death in January, 1960, testified that decedent, seemed "quite rational", "knew exactly what she was talking about", "received her mail and attended to it herself" and she did not notice any change in decedent's mental condition while in the Bishop Home.

Mrs. Harvey—obviously, as proponent's wife, an interested witness—testified to several visits with decedent at the Brookwood Home, two visits to the hospital and a visit on November 4, 1959 at the Bishop Home. On her last visit to the hospital, while Attorney Harvey was out of the room, this witness testified decedent said: "Mr. Harvey has been kind to me. I would like to see that he is taken care of, I would like to leave everything I have to him and Carrie", a statement reiterated on November 4, 1959 by the decedent in the hospital. In this witness' opinion decedent was sound mentally.

Mrs. Bessie Harris, decedent's friend and fellow guest at the Brookwood Home, stated that decedent

---

[5] In connection with Dr. Wentz's testimony, it may be well to note, as appellees' brief points out, there are various statements made in appellants' brief which are not supported by the record itself and, in some instances, by a failure to refer to an answer *in full*, the testimony is portrayed in a manner other than it appears of record. Such practice cannot be countenanced.

was "the most intelligent woman I have ever met", "a smart, intelligent woman", "quite up to date" and "interested in world affairs". Such testimony would certainly indicate that up until the time decedent left Brookwood Home—September 30, 1959—she was mentally sound.

Proponent further offered in evidence various exhibits, voluminous in nature, such as checks signed by decedent, letters from decedent to Attorney Harvey, check stubs over the period from February 1955 to December 1959 showing that decedent not only paid by her own checks for various items but that she was able to balance her own checkbook even while ill in the hospital, etc., all in proof of decedent's ability to conduct her own business affairs.

Contestants' (appellants') witness Dr. E. M. Kavjian, who treated decedent from 1942 to 1948 and from the fall of 1958 until the late spring or early summer of 1959, when asked by appellants' counsel whether in 1959 decedent was suffering from more than normal old age difficulties stated: "A. No, I don't think I could say that; I think a person of this age, her physical condition was consistent with the 82 years of age. I think she was fairly well preserved for a person of that age". Dr. Kavjian stated that in 1948 decedent had hypertension, cardiovascular disease, chronic cystitis and poor eyesight which necessitated that she wear very thick glasses. During 1959 he received an emergency call to see decedent and she was then "suffering from shortness of breath, swelling of the ankles, she had vomited, her color was somewhat cyanotic, bluish, and felt at that time that she had a failing heart" but that during the summer of 1959 she "improved considerably". He further stated that in 1959 she suffered from "advanced general arteriosclerosis". Despite these ailments which he outlined Dr. Kavjian found no evidence "that there was any effect on her mentality",

did not remember "any glaring defects in her mentality, either her thinking or her memory" and he subscribed to the statement that: "regardless as to what her physical condition may have been, I can't say there was anything wrong with her mentally."

Mrs. Pearl Lambirth, called by appellants, had known decedent since 1930 and had been her friend and confidant until 1955 to the extent that she had been named by decedent as a beneficiary in several wills made prior to 1955.[6] She testified that in 1949, after the death of Walter Gold, decedent "seemed to sort of let down", complained of high blood pressure, bleeding and an "itching condition". In 1954 over a period of three weeks or a month at the same time each morning this witness stated decedent would telephone her and say she was going to "jump off the roof that day" and the witness stated she would talk her out of doing so. She acknowledged that the relationship between decedent and herself was broken off in October, 1955 by the latter who said "I just don't want anything more to do with you". It is evident that this witness, up until 1955 a beneficiary in decedent's will, was not exactly disinterested and her testimony described decedent's condition only up until October, 1955, four years prior to the execution of this will.

In addition, appellants relied on certain hospital charts made while decedent was a patient in the Crozer Hospital. An examination of these charts reveals notations which indicate that on nine occasions (September 30, October 4th, October 5th, October 7th, October 10th, October 12th, October 15th, October 17th and October 18th) decedent was "confused". However, there is no notation on these charts showing any confusion subsequent to October 18th and, while Dr. Wentz

---

[6] The relationship between decedent and Mrs. Lambirth was broken off abruptly by decedent in 1955, *allegedly* because Mrs. Lambirth was trying to induce decedent to loan her $10,000.

was doubtful that decedent was confused at *any* time, he believed that, if there was any confusion, it was during the night while decedent was under sedation to enable her to sleep.

The burden was upon appellants to prove the lack of testamentary capacity at the time of the execution of the will and to sustain that burden appellants were required to produce evidence strong, clear and compelling in nature. A careful review of the instant record—placing little or no weight on the testimony of Attorney and Mrs. Harvey because of their obvious interest in this proceeding—patently indicates that appellants have completely failed to sustain their burden. All appellants have shown is that decedent, a woman of advanced age, had suffered for a number of years from arteriosclerosis, a heart condition, poor eyesight and had threatened to commit suicide five years prior to the date the will was executed, such threats having taken place over a three to four week period in 1954 and not again repeated. Contrasted to this evidence is the strong testimony of the subscribing witnesses, the attending physician, the supervisor at the Home and decedent's fellow guest at the Brookwood Home, all of which testimony clearly and unequivocally indicates that at the time of execution of the will or within a period shortly before and after the time of execution of the will decedent possessed testamentary capacity and had no mental infirmities. Not only have appellants not shown a lack of testamentary capacity but they have not even shown any mental weakness or infirmity of decedent at a time in close proximity to the time when the will was executed.[7]

---

[7] *Hall Will*, 402 Pa. 212, 166 A. 2d 644; *Cressman Estate*, 346 Pa. 400, 31 A. 2d 109; *Dichter Will*, 354 Pa. 444, 47 A. 2d 691; *Dugacki Will*, 356 Pa. 143, 51 A. 2d 627; *Brindle Will*, 360 Pa. 53, 60 A. 2d 1, and *Lare Will*, 352 Pa. 323, 42 A. 2d 801, relied on by appellants, are entirely inapposite to the present factual situation.

The court below very properly held that there was no substantial dispute of fact on the question of testamentary capacity such as would justify submission of that issue to a jury.

### Undue Influence

In our consideration of this phase of the appeal certain principles of law must be kept in mind: (1) to constitute undue influence there ". . . must be imprisonment of the body or mind, frauds or threats or misrepresentations, or circumstances of inordinate flattery, or physical or moral coercion to such a degree as to prejudice the mind of the testator, or destroy his free agency, or to operate as a present restraint upon him in the making of the will: [citing cases]": *Quein Will,* 361 Pa. 133, 145, 62 A. 2d 909; (2) "Where there is no evidence of *weakened intellect* the burden is upon those asserting undue influence to prove it even though the bulk of the estate is left to those occupying a *confidential* relation: . . .:" *Quein Will,* supra, 145; Ash Will, 351 Pa. 317, 41 A. 2d 620; *Kerr v. O'Donovan,* 389 Pa. 614, 134 A. 2d 213; (3) where there is evidence of *confidential* relation coupled with a *weakened mind,* the burden is upon the proponent to prove a lack of undue influence: *Quein Will,* supra, 145; *Kerr v. O'Donovan,* supra, 627; (4) while undue influence may be established by circumstantial evidence (*Quein Will, supra,* 146; *Kerr v. O'Donovan,* supra, 628), conjecture and suspicion do not take the place of testimony (*Royer's Estate,* 339 Pa. 423, 12 A. 2d 923; *Kerr v. O'Donovan,* supra, 628).

An examination of the instant record reveals *no evidence of a weakened intellect* on the part of decedent at the time she executed this will, the evidence being only that decedent suffered various physical infirmities. However, the record does show that for a period of approximately sixteen years Attorney Har-

vey had been attorney not only for decedent but for her brother Walter Gold and her sister Eva Gold. Moreover, Attorney Harvey was consulted time and again by decedent not only concerning legal but personal matters and decedent placed in him the utmost of trust and confidence. In short, it is clear that a confidential relationship did exist between Attorney Harvey and the decedent.

Furthermore, the record indicates that, on the evening of November 4, 1959 at the Bishop Nursing Home, decedent indicated that she desired to change her will and gave Attorney Harvey certain instructions of which he made a memorandum; that Attorney Harvey then went to Attorney Bowden, acquainted him with decedent's instructions and Attorney Bowden the next day prepared the will in accordance with the instructions given him by Attorney Harvey; that he turned the finished will over to Attorney Harvey who that evening took it to the Bishop Home for execution. For all practical purposes, Attorney Harvey, not Attorney Bowden, prepared this will. However, all these facts did not place upon Attorney Harvey the burden of proving a lack of undue influence, in the absence of proof of a weakened intellect on decedent's part.

Appellants urge that Carrie Brown, legatee of two-fifths of decedent's estate, likewise had the same burden. With that we cannot agree. While Carrie Brown did occupy a confidential relationship to the decedent, there is no evidence of a weakened intellect on the part of the decedent nor is there any evidence whatsoever that Carrie Brown even knew of, let alone participated in, the making of the will. Under such circumstances, there was no burden upon Carrie Brown to prove a lack of undue influence.

We have carefully examined this voluminous record in its entirety. No useful purpose can be served by outlining in detail all the evidence given by the various

54

witnesses. Suffice it to state that we have been unable to find any evidence whatsoever of any undue influence exerted by anyone, particularly Attorney Harvey and Carrie Brown, upon the decedent to make the will in the manner in which it was made. On the contrary, the record clearly indicates that this will was an expression of that which decedent of her own volition and free will sought to accomplish in the post mortem disposition of her estate.

Great stress is placed upon an incident wherein a change was effected in decedent's instructions to Attorney Harvey on the evening of November 4, 1959. Decedent told Attorney Harvey that he was to receive 2/3's and Carrie Brown 1/3 of the residuary estate. In relaying this instruction to Attorney Bowden, he told him "that Miss Gold means that my full share of the estate will amount to 2/3s of the estate, and she always included in what I should receive my commission as executor. Now I believe, that what she meant was that I would get about 3/5s and Carrie 2/5s and we better write it out that way because I want to make sure I do what Miss Gold wants."[8] Attorney Harvey testified that, when he returned to the Bishop Home on the evening of November 5, 1959 with the prepared will, he said to the decedent: ". . . Last night you told me that you wanted me to have two-thirds and Carrie one-third. I said when I first wrote your will after Walter died, you said you weren't making a bequest to me because I should have my commissions. I figured it out that 3/5s plus my commissions would give me almost the equivalent of 2/3s of your estate, is that the

---

[8] 
| | | |
|---|---|---|
| Gross estate | $ 84,000 | |
| Net estate for distribution | 61,000 | |
| 2/3 of Net Estate | | $ 40,666. |
| 5% Commissions on Gross Estate | 4,200 | |
| 3/5 of Net Estate | 36,666 | |
| Commissions plus 3/5 of Net Estate | | 40,866 |

way you want it. . . . *She said something commendable and she said, that is just the way I want it.*[9] Then I read about the executor and she just nodded her head." Appellants argue that this is "a concrete, expressed, overt act of undue influence", and "also a fraud" and an example "of a beneficiary soliciting a change of the mind of the decedent". To that argument there is no merit. If the uncontradicted testimony is to be believed the instructions were changed and the will prepared to conform to the change, but the will was not executed until after the change had been fully explained and assented to by decedent. There is nothing to suggest any coercion or restraint by Attorney Harvey upon decedent in effecting this change.

This will, from evidence uncontradicted on this record, is a most natural will under the circumstances. The decedent, as the result of the will contest threatened by her brothers, Howard and Clifford Gold, and finally settled, disassociated herself from and irrevocably cut off relations with not only her brothers but with members of her brothers' families. Neither brother had seen decedent for almost ten years before her death and the nephew and the niece had never seen the decedent. On the other hand, the record is abundantly clear that for many years Attorney Harvey and Carrie Brown were the only persons genuinely interested in decedent's welfare, such interest being evidenced by visits, ministrations and in various other ways. The logical persons to be the primary objects of decedent's bounty under the circumstances were Attorney Harvey and Carrie Brown, the two residuary legatees.

Lastly, contestants urge that, if the burden of proof is placed upon the proponent, then an issue *must*

---

[9] This emphasized sentence was left out of the quotation of the record as it appears in appellants' brief.

*always* be awarded. Such is not the law. Even though the burden of proof is upon a proponent of a will, yet, if viewing all the evidence in it entirety the dispute of fact is not substantial, an issue need not be directed. To the extent that language in *Stewart Will*, 354 Pa. 288, 47 A. 2d 204 might be subject to a construction which would indicate otherwise, such language is disavowed.

Under the instant record the court below properly refused an issue d.v.n. on the questions of testamentary capacity and undue influence. Not only did the court below not abuse its discretion but, on the contrary, had it granted an issue on either ground it would have abused its discretion.

Decree affirmed. Costs on appellants.

Mr. Justice Cohen dissents.

