## Powell Estate

Before Klein, P. J., Bolger, Lefever, Saylor, Shoyer and Burke, JJ.

*Lawrence J. Richette, Hugh J. Monaghan* and *Frank F. Truscott,* for exceptants.

*John R. McConnell, Angus M. Russell* and *Morgan, Lewis & Bockius, Robert L. Trescher* and *Montgomery, McCracken, Walker & Rhoads, Joseph X. Yaffe* and *Yaffe & Gould* and *Evelyn M. Trommer,* contra.

KLEIN, P. J., January 8, 1968.—Elizabeth L. Powell died unmarried, on August 4, 1964, at the age of 82, a resident of Philadelphia. She had been a widow since

1932. A writing, bearing date May 23, 1963, was admitted to probate, as her last will, on August 10, 1964, by the Register of Wills of Philadelphia County. Letters testamentary were issued thereon to Boyd L. Spahr, Jr., a member of the Philadelphia bar, and Girard Trust Corn Exchange Bank (now Girard Trust Bank). Decedent's entire estate was left to charity, under the provisions of this will.

Eutha Rihm, a niece, and Kenneth W. Amrhine, a grandnephew of testatrix, have appealed from the probate. They allege, inter alia, in their petition that:

"5. Your Petitioners believe and expect to be able to prove that at the time of the execution of said writing the physical and mental condition of the decedent were greatly impaired by illness and infirmity and that she was not a person of sound mind capable of disposing by Will of her estate and further that said writing was procured by undue influence, duress and constraint practiced upon said decedent by Boyd L. Spahr, Jr., and Stanley David Hart, an officer of Girard Trust Corn Exchange Bank (now Girard Trust Bank) said Boyd L. Spahr, Jr. and Girard Trust Corn Exchange Bank (now Girard Trust Bank) being named in said writing as Executors".

A citation was issued to all parties interested in decedent's estate as "heirs, relatives and next of kin, devisees, legatees or Executors" to show cause why the said appeal should not be sustained and the decree of the register set aside and an issue be directed to try by a jury the following questions of fact:

"1. Whether or not at the time of the execution of said writing the decedent was a person of sound mind.

"2. Whether or not the said writing was procured by undue influence, duress and constraint practiced upon said decedent by Boyd L. Spahr, Jr., and Stanley David Hart and others".

Responsive answers were filed by the executors and

the charitable legatees, in which they make a complete denial of all of petitioner's material allegations and ask for a dismissal of the petition.

At the outset of the hearings, counsel for the proponents challenged the right of the contestants to institute these proceedings, contending that it was necessary for them to establish, preliminarily, their relationship to decedent in order to have standing to be heard. The hearing judge confirmed this position, as a result of which considerable oral and documentary testimony was submitted by the contestants to prove their kinship.

From a study of this testimony, the hearing judge is satisfied that Eutha Rihm and Kenneth W. Amrhine, the contestants, as well as Frederick L. Luthardt, Viola L. Horan, Gloria Winegarden, Paul L. Luthardt, Maxine L. Rackaukus, alias dictus Maxine Rice, Irma Naomi Scheferman, Charles J. Luthardt, Myrtle Pannell and Dorothy M. Costin are all surviving issue of Elizabeth L. Powell's deceased brothers and sisters and as such are her next of kin, entitled to her estate under the intestate laws. Accordingly, the contestants were permitted to continue with the proceedings.

The whereabouts of Maxine L. Rackaukus is unknown. A decree was entered on December 22, 1966, appointing Lisa A. Richette, Esq., as trustee ad litem to represent her interests in these proceedings.

In order to get a proper perspective of this case, it is necessary to review briefly the circumstances with relation to Verna Groves, Mrs. Powell's only child.

Verna was married to Charles Groves, a successful wholesale grocer. No children were born of this marriage. Charles Groves died in 1961, leaving his entire estate of approximately $1,300,000 to Verna. On April 11, 1963, Verna made a will, in which she named Boyd Lee Spahr, Jr., and Girard Trust Corn Exchange Bank (now Girard Trust Bank) as executors and trustees.

Under the provisions of her will, she created a trust in the sum of $250,000, and directed that "the trustees shall pay or apply the net income therefrom and so much of the principal as they deem necessary for the benefit and support of her mother, Elizabeth L. Powell, for life". Upon the mother's death, the principal of the trust was payable to the residuary legatees. She then bequeathed pecuniary legacies, totalling $160,000, to friends and relatives and to relatives of her deceased husband. The residue of her estate, which totalled approximately $850,000, she left in the following manner:

"TWELFTH: I direct that the residue of my estate, real and personal, shall be divided into nineteen (19) shares which I give as follows:

"(a) 5 shares each to The Mother Church, The First Church of Christ, Scientist, in Boston, Massachusetts, and to the Lankenau Hospital, Overbrook, Pennsylvania, in memory of my husband, Charles Groves.

"(b) 1 share each to the American Red Cross Southeastern Pennsylvania Chapter, The Salvation Army in Philadelphia, American Cancer Society Philadelphia Division, Inc., Heart Association of Southeastern Pennsylvania, Goodwill Industries of Philadelphia and Vicinity, Society for Crippled Children and Adults of Montgomery County, Philadelphia Association for the Blind, Inc., Multiple Sclerosis Society and Arthritis and Rheumatism Foundation Eastern Pennsylvania Chapter".

Verna died on May 4, 1963, which was less than 30 days after the date of the execution of her will, bringing into operation section 7 of the Wills Act of April 24, 1947, P. L. 89, which provides:

"(1) Death Within Thirty Days; Religious and Charitable Gifts. Any bequest or devise for religious or charitable purposes included in a will or codicil ex-

ecuted within thirty days of the death of the testator shall be invalid *unless all who would benefit by its invalidity agree that it shall be valid. . ."* (Italics supplied.)

As Verna had no children, the person who would benefit by the invalidity of the gifts to the charities was her mother, Elizabeth L. Powell, our decedent, who was entitled to the residue of Verna's estate as her sole next of kin under the intestate laws.

When Verna died, Mrs. Powell was 81 years of age and resided alone in a small apartment in the Brighton Court Apartments, located at 6212 Chestnut Street in Philadelphia. She was suffering from some infirmities brought on by old age. In 1957 she had a breast removed because of malignancy. She also was plagued with an arthritic condition which caused her considerable pain and discomfort and resulted in her hospitalization in the Lankenau Hospital for a period of five days, from June 3, 1963, to June 7, 1963.

On May 9, 1963, five days after Verna's death, Mr. Spahr and Stanley David Hart, Senior Trust Officer of Girard Trust Bank, assigned to the administration of Verna's estate, called on Mrs. Powell, together with William J. Smedley, now retired, who was then an Assistant Treasurer of Girard. They informed her that the gifts to the charities would be invalid unless she agreed that they be paid. She refused to validate the gifts to the charities and decided that she would take the residue saying, "I'm like anybody else; I want the money".

Mr. Spahr and Mr. Hart visited Mrs. Powell again a week later, on May 16, 1963, at which time she gave Mr. Spahr instructions to prepare a will for her. They returned on May 23, 1963. Mr. Spahr read the will to Mrs. Powell, while she followed what he was reading with a copy of the will which he had given her. She indicated that she was satisfied with its provisions, and

signed the document in their presence, and they acted as subscribing witnesses.

It is this will which is now under attack. Under its provisions, Elizabeth L. Powell bequeathed her entire estate, the funds which she inherited from Verna as well as her own assets, which consisted of securities valued at approximately $20,000, *to precisely the same charities in precisely the same proportions as Verna did in her will.* She also named Boyd Lee Spahr, Jr., and Girard Trust Bank, the executors which were designated by Verna, as her executors.

When Messrs. Spahr and Hart, the subscribing witnesses, were first examined, they testified that the will was executed on May 23, 1963, and that they had visited Mrs. Powell at her apartment in the Brighton Court Apartments on one previous occasion, on May 16, 1963. It later developed that they were both mistaken on this point and that they had also visited her on May 9, 1963. That is, they had visited her on three occasions, and not two as they had originally stated. They were both recalled and corrected their testimony. There were also some other inconsistencies in their testimony on several minor facts. As a consequence, counsel for some of the contestants charge them with deliberate perjury and argue strenuously that their testimony should be disregarded.

The hearing judge regards these discrepancies in a different light. True, Mr. Spahr and Mr. Hart were careless in their failure to keep proper and accurate written memoranda concerning their visits to Mrs. Powell. The hearing judge believes, however, that these inaccuracies suggest that they were honest in their testimony. If they were guilty of the unethical conduct attributed to them by the contestants, they would have been extremely careful to make certain that their testimony harmonized and was free from inconsistencies.

Boyd Lee Spahr, Jr., has been a member of the Philadelphia bar for more than 30 years. He is regarded as an honorable gentleman of unimpeachable character, who has always adhered to the highest traditions and standards of the legal profession. The hearing judge has implicit faith in his probity and veracity and accepts his testimony as truthful and worthy of belief.

Mr. Hart, the other subscribing witness, has been employed by Girard Trust Bank for over 30 years and is presently a senior trust officer. The hearing judge was impressed with his demeanor on the stand and is satisfied that his testimony on all important points was accurate and truthful.

In spite of the inconsistencies in their testimony both as to the dates of their visits and some of the attending incidents with respect thereto, Mr. Spahr and Mr. Hart were both firm in their testimony that the will was executed by Mrs. Elizabeth L. Powell in her apartment on May 23, 1963, after it was carefully read to her, that she understood its provisions, which fully represented her wishes, and that she was mentally competent when she signed the document of her own free will.

William J. Smedley was called in behalf of the proponents. In 1963 he was employed by Girard. It was his duty to visit depositors of the bank in order to help retain their business. In this capacity he had been calling on Verna, and upon her death, called upon Mrs. Powell on May 8, 1963, at which time he conversed with her, and she told him that she grew up in Baltimore and had many relatives but she hadn't seen any of them for many years. He accompanied Messrs. Spahr and Hart when they visited Mrs. Powell on May 9th. Mr. Smedley testified that "she (Mrs. Powell) was composed and carried on a conversation with them in a normal way, I think. I didn't see anything unusual

about it". He also saw her on June 14th, at which time "She was composed and carried herself in a way that was a normal person". He saw her again in the middle of July, at which time he said she was "just the same as before—a composed person".

The proponents also called Dr. John Rush Shanahan, Mrs. Powell's attending physician, in support of the validity of the will. Dr. Shanahan treated Mrs. Powell from October 1962, when she was brought to his office by her daughter, Verna, until shortly before her death in August 1964. He is on the staff of the Lankenau Hospital and the Graduate Hospital of the University of Pennsylvania, and has been certified by the American Board of Internal Medicine, specializing in rheumatology, which is the study and treatment of arthritis and associated disorders. He diagnosed Mrs. Powell's ailment as "osteo-arthritis chiefly of the cervical spine but the spine in general". During the period that he cared for decedent, he saw her eight or nine times in his office and probably the same number of times in her home. Dr. Shanahan stated that he thought Mrs. Powell to be normal mentally throughout his acquaintance with her. He testified, page 1189:

"Q. Doctor, you said you thought she was normal at all times?

"A. Yes, sir.

"Q. What does that mean—normal?

"A. Well, in my dealings with her I thought that she was—she stated her problems in a succinct fashion, and she repeated her problems when they required repetition in the same manner in which she originally stated them, and she was reasonably well able to cite the onset and duration of symptoms and reported on medication that was taken properly, and in my general discussion she seemed to have a good grasp of where she was and who I was and what I was doing there.

"Q. That is your general feeling about her for the entire period?

"A. Yes".

Two letters, introduced into evidence by the proponents, firmly support their contention that testatrix had refused to validate the invalid gifts to the charities under Verna's will, but also knew that she had executed a will in their favor.

On July 12, 1963, two months later, Mr. Spahr wrote to Mr. Hart, with reference to the incorrect designation of one of the charitable remaindermen. Mr. Hart brought this letter to Mrs. Powell and on July 15, 1963, she signed the following note which Mr. Hart wrote on the letter:

"One of the residuary legatees of my will is designated, 'Society for Crippled Children and Adults of Montgomery County'. This is to record that I intended to designate the 'Society for Crippled Children and Adults of Philadelphia, Bucks, Chester, Delaware and Montgomery Counties' ".

On September 18, 1963, which was almost four months after the execution of the will, she signed and mailed to Mr. Spahr and the bank, as executors under Verna's will, the following letter which clearly indicated that she was fully aware of her rights by reason of Verna's death within 30 days of the making of her will:

"Gentlemen:

"I am the sole heir at law of my daughter, Verna P. Groves, who died May 4, 1963, without husband or issue surviving her.

"In her will she left her entire residuary estate to various charities. I am informed that since her death occurred within thirty days of the execution of her will, the bequests to the charities are invalid under the provisions of Section 7 (1) of the Wills Act of

1947, unless I, the sole person who will benefit by the invalidity, agree otherwise.

"This is to advise you that I desire to take the entire residuary estate as the sole heir of my daughter.

"Very truly yours,
"Elizabeth L. Powell
"/s/ Elizabeth L. Powell
"Sept. 18th, 1963"

Where a will is drawn by an attorney selected by testator and proved by subscribing witnesses, the burden of proving lack of testamentary capacity and undue influence can be sustained only by clear and strong or compelling evidence, and this is especially so if proponents were corroborated by the attending physician: Williams v. McCarroll, 374 Pa. 281 (1953). See also Kane's Estate, 206 Pa. 204 (1903); Leisey's Estate, 280 Pa. 533 (1924); Johnson Will, 370 Pa. 125 (1952); Citizens National Bank v. McCafferty, 383 Pa. 588 (1956); Protyniak Will, 427 Pa. 524 (1967). The testimony produced by the contestants failed to meet this requirement.

The contestants rely chiefly in support of their position upon the testimony of three of Mrs. Powell's neighbors at the Brighton Court Apartments, namely, Mr. Henry H. Roelofs, his wife, Ethel, and Mrs. Gertrude M. Flynn.

It is evident from their testimony that they resented decedent's conduct and regarded her as extremely ungrateful because, after she became wealthy, she moved without saying goodbye or thanking them for their many kindnesses to her.

Ethel Roelofs is a manicurist. She and her husband had been next door neighbors of Mrs. Powell for about 20 years. According to her, Mrs. Powell was a very difficult, unkempt, nasty, unfriendly woman, given to excessive drinking. She testified that in her opinion Mrs. Powell did not have testamentary capacity and

had been "wacky" for years. Yet she testified (page 424) that decedent told her that she had "inherited a million dollars from her daughter", and at page 414:

". . . She said that she had nothing to worry about, that she was very wealthy, the Girard Estate (sic) was going to take care of all her affairs, and going to move her to a very magnificent apartment on Rittenhouse Square".

The hearing judge's confidence in her reliability was shaken because of her testimony with respect to a will Mrs. Powell had executed on December 1, 1962, which was about six months before the signing of the contested will. Mrs. Roelofs testified, page 433:

"Q. What about at the time when she made her first will?

"A. I don't know anything about that. I don't know anything about her first will.

"Q. Well, I mean the will in December of 1962 that she had. You knew about that, didn't you?

"A. I didn't.

"Q. Didn't she make a will in December of 1962?

"A. Not that I know of".

When confronted with the will, dated December 1, 1962, she admitted she and her husband had acted as witnesses to this will, which was signed by Mrs. Powell. However, even after she had carefully examined this document, she had no recollection of having ever seen it before. She testified, page 435:

"Q. So you don't remember where this was signed or when or anything about it?

"A. I am sorry. I don't ever remember signing it and I don't know why. It's not too long ago".

In describing Mrs. Powell as "wacky", the hearing judge understood Mrs. Roelofs to mean that she was mentally sick and incompetent.* If Mrs. Powell had

---

* Webster's 3rd New International Dictionary, page 2568 defines: Wacky (Whacky) as eccentric or irrational especially in an amusing, absurd or fantastic manner. Syn. Crazy or insane.

been "wacky" for years, she was "wacky" on December 1, 1962. If Mrs. Powell was mentally incompetent when she signed this will, Mrs. Roelofs should not have acted as a subscribing witness to it. The attestation of a signature to a will is a direct assertion by the witness that the maker is competent to understand and execute it: Snyder's Estate, 279 Pa. 63 (1924). See also cases cited in 1 Hunter O.-C. Commonplace Book §14(a). Furthermore, the execution of Mrs. Powell's will was obviously the most important single incident in Mrs. Roelofs' relationship with Mrs. Powell. Since she completely forgot this important, formal event, we must conclude that she is extremely untrustworthy and her testimony not worthy of serious consideration.

Mr. Roelofs is tarred with the same stick. Although he testified that, in his opinion, Mrs. Powell was not capable of making a will, he acted as a subscribing witness to the one she did make. Like his wife, he said he remembered nothing about witnessing a will in 1962. When questioned further, he recalled the incident and testified, page 456:

"Q. Did you think she was able to make a will at that time?

"A. That's four years ago.

"Q. Did you think she was able to make a will at that time?

"A. No.

"Q. You did not think she was able to make a will then?

"A. No.

"Q. Then why did you sign as a witness?

"A. Because we were neighbors.

"Q. You mean you signed this will as a witness even though you did not think she was able to make a will?

"A. That's right".

Mr. Roelofs performed many little services for Mrs.

Powell. He purchased her groceries, cashed her dividend checks, purchased whiskey for her and did other little errands. In all of these transactions, her conduct seemed to be perfectly normal. Mr. Roelofs had previously undergone a throat operation which affected his voice in such a manner that it was so inaudible that neither the court nor counsel were able to understand him. As a result, at the request of Mr. Truscott, one of the counsel for the contestants, Mrs. Roelofs was permitted to act as interpreter for him. Mr. Roelofs testified that Mrs. Powell could understand him in spite of this serious speech defect. This would indicate that she was a person of acuity with excellent hearing. Mr. Roelofs testified, further, that they told each other jokes daily, that she had a sense of humor, saw the point in the jokes and enjoyed them. This ability to intelligently exchange jokes strongly negates Mr. Roelofs's statements concerning Mrs. Powell's mental deficiencies, since a capacity for humor is generally recognized as indicative of a capacity for abstract reasoning.

Mrs. Gertrude M. Flynn lived across the hall from Mrs. Powell. Mrs. Flynn stated that she knew Mrs. Powell from the fall or winter of 1962. It is clear from her testimony that (1) Mrs. Powell knew that she had inherited a million dollars from her daughter, Verna; (2) that she wasn't going to let the charities get the money under Verna's will; and (3) that she had some relatives in Baltimore. Her relationship to Mrs. Powell was obviously strained, because Mrs. Powell apparently thought she was stealing from her and treated her very badly. She testified, page 294:

". . . We cleaned the drawers out, and, by the way, when we were cleaning the drawers out I felt as if I was stealing or something. She would say, 'Look at the things. Verna had this. Verna had that.'

"Q. Indicating you had stolen it?

"A. Yes. She used to treat me so bad when I went in there to help her I just had to tell her I wasn't her servant. . . ."

The thrust of her testimony was that Mrs. Powell suffered from severe headaches and was in such great pain when she signed her will that she could not have known what she was doing or the nature of her act. She testified (page 282) that on May 23rd:

"A. After they had left she came over and she was in a terrible state. She said she didn't know how she went through it. They had given her papers to read. One of them had read one paper and gave her a paper to read and she didn't know what it was all about. She couldn't even know what they were talking about, that her head—she was in such a condition".

It also seems obvious that Mrs. Powell did not take Mrs. Flynn into her confidence about her affairs. Mrs. Flynn testified (p. 314):

"Q. Actually you knew very little about her business, I guess. You didn't know, for example, that she had written a will before the lawyers came?

"A. No, I did not.

"Q. She never told you about that?

"A. No. That was a surprise.

"Q. Did you ever ask her about that?

"A. No.

"Q. You never asked her any questions, I suppose?

"A. No.

"Q. You didn't know that she had any relatives other than those you mentioned in Baltimore?

"A. No. She did say she had relatives in Baltimore.

"Q. During all this time she spent talking with you she never told you anything about her will?

"A. No, sir. I never asked her. I never thought to get into a subject like that. Do you mean about her first will?

"Q. Her first will.

"A. No, sir.

"Q. Never did?

"A. No.

"Q. Would it be fair to say, then, she probably didn't want you to know about that?

"A. Oh, definitely not a thing like that. Who wants to go around telling people they have a will made out? No".

The hearing judge believes, as a result of his study of Mrs. Flynn's demeanor on the witness stand and her testimony in general, that she was prejudiced and has greatly exaggerated Mrs. Powell's condition and confused the visit by Mr. Spahr and Mr. Hart on May 23rd when the will was executed with one of their earlier visits. In view of the abundance of reliable evidence in support of the validity of the will, the hearing judge is compelled to conclude that Mrs. Flynn's story must be rejected as unworthy of credence. The hearing judge is satisfied that although Mrs. Powell may have been in some pain from her arthritis at the time when she executed her will, she was mentally competent and fully understood the nature and import of her act.

The only medical testimony offered by the contestants was that of Dr. Marvin Heller, a psychiatrist, who had been certified by the American Board of Neurology and Psychiatry. Dr. Heller is Associate Professor of Psychiatry in the Temple University School of Medicine. Dr. Heller is well known to the hearing judge, who has a high regard for him as a psychiatrist and a teacher. However, in the present case his testimony is of very little value. Dr. Heller never saw decedent, and frankly admitted that he could not "state with any degree of categorical certainty that she was incompetent at" the time the will was executed. Opinion evidence of an expert, whether he be a doctor or any other kind of expert, is, in cases of for-

gery, undue influence, mental capacity and insanity of very little weight and cannot prevail against direct factual credible evidence: Kadilak Will, 405 Pa. 238 (1961) ; Sommerville Will, 406 Pa. 207 (1962).

The testimony of Doris L. Harter, a niece of Mrs. Powell by marriage, and her mother, Johanna E. Guest, called as witnesses by contestants clearly indicates that Mrs. Powell was a person of sound mind fully aware of her financial affairs subsequent to the day she signed her will. They visited her in July of 1963 at Park Towne Place. It is evident from their testimony that Mrs. Powell knew that she had inherited about $1,000,000 from Verna; that she had the unrestricted right to dispose of this money by will in any manner she desired, and that she had relatives in Baltimore. It is also crystal clear that they believed she was mentally competent to make a will in July 1964, when she was in her terminal illness in the Presbyterian Hospital, because they tried at that time to set up an appointment for counsel to prepare a new will.

The courts in this state have uniformly held that if a testator appreciates in a general way who his relatives are and what property he possesses, and indicates an intelligent understanding of the disposition he desires to make, he has testamentary capacity. See Olshefski's Estate, 337 Pa. 420 (1940) ; Ash Will, 351 Pa. 317 (1945) ; Sturgeon Will, 357 Pa. 75 (1947) ; Brantlinger Will, 418 Pa. 236, 247 (1965). The test of capacity is that testator's mind and memory were sufficiently sound to enable him to know and understand the business in which he was engaged: McNitt's Estate, 229 Pa. 71 (1910) ; Snyder's Estate, 279 Pa. 63 (1924) ; Guarantee Trust & Safe Deposit Co. v. Heidenreich, 290 Pa. 249 (1927). Moreover, less capacity is needed to make a valid will than is sufficient in most cases to transact ordinary business:

Guarantee Trust & Safe Deposit Co. v. Waller, 240 Pa. 575 (1913); Olshefski's Estate, supra; Higbee Will, 365 Pa. 381 (1950); Conway Will, 366 Pa. 641 (1951); Thompson Will, 387 Pa. 82 (1956). Although inability to transact business does prove incapacity (Brennan's Estate, 312 Pa. 335 (1933)), the ability to transact business is evidence of testamentary capacity: Smith's Estate, 250 Pa. 67 (1915); Kline Will, 382 Pa. 395 (1955); Heyburn Estate, 85 Pa. Superior Ct. 230 (1925).

From a study of proponents' witnesses as well as several of those called in behalf of the contestants, the evidence is clear that Elizabeth L. Powell was a strong willed woman, who personally was able to manage her limited personal business affairs before and after May 23, 1963, the date upon which the will was executed. It is equally clear that she knew that she had inherited approximately a million dollars from her daughter, Verna, and that, by her refusing to validate the gift to the charities, she was free to dispose of this money as she saw fit. It is also evident that she knew she had some family in Baltimore, but that she was completely estranged from them and they had no communication with her.

Mr. Justice (now Chief Justice) Bell, speaking for an unanimous court, carefully reviewing the law applicable in cases such as this, stated, at page 293, in Williams v. McCarroll, 374 Pa. 281 (1953):

". . . Moreover, as Mr. Justice Stearne said in Roberts Will, 373 Pa. 7, 17, 94 A. 2d 780: ' ". . . In Aggas v. Munnell, 302 Pa. 78, 85, 152 A. 840, the law is well stated: 'Neither old age, nor its infirmities, including untidy habits, partial loss of memory, inability to recognize acquaintances, and incoherent speech, will deprive a person of the right to dispose of his own property . . . Mr. Justice Kephart, speaking for the Court, in Lawrence's Est., 286 Pa. 58, states,

. . . : "Old age, sickness, distress, debility of body, peculiar beliefs and opinions, incapacity to do business, partial failure of memory, neither prove nor raise a presumption of incapacity" ' " ' ".

The hearing judge is completely satisfied, and finds as a fact, that Elizabeth L. Powell, testatrix, was a person of sound mind, possessed of testamentary capacity when she executed her will on May 23, 1963.

In order to establish undue influence to set aside a will, there must be imprisonment of the body or mind, fraud or threats or misrepresentation, or circumstances of inordinate flattery, or physical or moral coercion, to such a degree as to prejudice the mind of testatrix, or destroy her free agency, or to operate as a present restraint upon her in the making of the will: Paul Will, 407 Pa. 30 (1962); Farmer Will, 385 Pa. 486 (1956); May v. Fidelity Trust Company, 375 Pa. 135 (1953); Quein Will, 361 Pa. 133 (1949).

In Abrams Will, 419 Pa. 92 (1965), Mr. Justice Jones, speaking for a unanimous court, said, at page 99:

"As to undue influence, certain principles are established beyond question: (1) there is a *presumption* of the absence of undue influence and the *initial* burden of proof is on the contestant; (2) absent evidence of *weakened intellect*, the burden is upon those asserting it to prove undue influence even though the bulk of the estate is left to those occupying a confidential relationship; (3) when there is evidence of *confidential relation* coupled with *weakened intellect*, the burden of proof shifts to the proponent: Quein Will, 361 Pa. 133, 145, 62 A. 2d 909; Gold Will, 408 Pa. 41, 52, 182 A. 2d 707".

In Paul Will, supra, the court said, at page 35:

". . . (3) where it is charged that a person of sound mind and possessing testamentary capacity has been subjected to undue influence, the evidence to sup-

port such charge must be clear and convincing (Cressman Estate, 346 Pa. 400, 404, 31 A. 2d 109; Royer's Estate, 339 Pa. 423, 424, 425, 12 A. 2d 923; Fink's Estate, 310 Pa. 453, 456, 165 A. 832; Eble v. Fidelity Title & Trust Co., etc., 238 Pa. 585, 589, 86 A. 485) and mere suspicions, opinions or beliefs not founded on established facts are insufficient to support such charge (Cressman Estate, supra, 404; Royer's Estate, supra, 425) ; . . ."

The contestants have wholly failed to meet the burden which is placed upon them by law. None of the elements which constitute undue influence have been established in this case. Not a scintilla of credible evidence has been produced to substantiate the allegations that Boyd L. Spahr, Jr., Stanley David Hart, or any other person exercised undue influence upon testatrix in connection with the preparation or execution of the will which is under attack. Mrs. Powell lived at Park Towne Place for over a year, subsequent to the execution of her will on May 23, 1963. During this period she was a completely free agent. She could come and go as she pleased and could have any visitors she wished to have. She was at liberty, if she had so intended, to have made any changes in her will that she desired, and could have selected any attorney of her choice to effect these changes. The lapse of more than a year, during which testatrix had full opportunity to revoke her will, must be regarded as an affirmance thereof. See Ferner v. Byers, 219 Pa. 160 (1907) ; South Side Trust Company v. McGrew, 219 Pa. 606 (1908) ; Ewart's Estate, 246 Pa. 579 (1914) ; Wertheimer's Estate, 286 Pa. 155 (1926) ; White's Estate, 262 Pa. 356 (1918) ; Buck's Estate, 56 Pa. Superior Ct. 373 (1914).

The contestants argue that the burden of establishing testamentary capacity and lack of undue influence shifted to the proponents and rely upon Adams'

Estate, 220 Pa. 531 (1908), in support of their contention. In that case, a confidential advisor procured a will in which he was named executor and trustee with a possible residuary interest in the whole estate. The Supreme Court, speaking through Mr. Justice Elkin, said, at page 533:

"It appears from the testimony that the testatrix two years prior to the making of her will had a stroke of paralysis which weakened her mentally and physically, and after being thus stricken, she became hysterical, melancholy, nervous, suspicious of her servants, fearful she might end her days in the almshouse, would cry out without reason, was peevish and childish, continually laughing and crying. An attending physician testified that 'her mind was enfeebled but not unsound.' Under these circumstances the learned trial judge was reasonably justified in reaching the conclusion 'that Mrs. Adams was possessed of testamentary capacity,' and certainly did not overstate the facts when he said, 'Her mind from June, 1902, up to the time of her death was enfeebled as a result of her illness, and in a condition easily susceptible to flattery, persuasion or influence' ".

In our opinion, the circumstances in the instant case are so different from those which were present in Adams' Estate that it must be regarded as inapposite. We believe that the rule which is applicable here was enunciated by Mr. Justice (later Chief Justice) Maxey in Wetzel v. Edwards, 340 Pa. 121 (1940), at page 124:

". . . Appellee received no bequest. He was named as executor, but whatever his compensation as such might be was not a gift but compensation for services rendered. In Linton's Appeal, 104 Pa. 228, this court held that the fact that a person was made one of the executors of a will, but not a legatee or devisee thereunder, is not sufficient to cast upon him the burden

of proving testamentary capacity and the absence of undue influence".

See also Griffith Estate, 63 Montg. 275, 289 (1947).

Neither Mr. Spahr, Mr. Hart, nor Girard were named as beneficiaries by Mrs. Powell in her will. Designation of Mr. Spahr and Girard as executors does not constitute them beneficiaries. Any compensation which they will receive for services rendered as executor or attorney will be for services rendered and subject to the strict supervision of the court. Moreover, the fact that substantially the same funds which are being administered in this estate were also handled in Verna's estate will be a material consideration by the court in awarding compensation in the present estate.

However, if we admit, for the sake of argument and for that purpose only, that the burden of establishing testamentary capacity and lack of undue influence shifted to the proponents, we unhesitatingly rule that they have fully met this burden.

Under the circumstances of this case, it is manifest that Mrs. Powell's will was natural in every respect. Verna left the bulk of her estate to designated charities. Mrs. Powell would not have received the principal of Verna's estate except for her unanticipated death within 30 days of the execution of the will. Certainly, the contestants and decedent's other relatives had no claim upon her bounty. They were completely estranged from her and she did not know whether they were living or dead. Although most of the family lived in and around Baltimore, which is but 100 miles from Philadelphia, none of them ever communicated with Mrs. Powell. Eutha Rihm, one of the petitioners, testified she had never met Mrs. Powell, and Kenneth W. Amrhine, the other petitioner, who is 49 years of age, last saw her when he was but six years of age. Paul Herman Luthardt and Irma Naomi Schiferman, who

are also relatives and were called as witnesses, stated that they had never seen Mrs. Powell, and Myrtle V. Pennell, another relative, testified that she was 70 years of age and had not seen Mrs. Powell for 60 years. Under these circumstances, it was but natural for decedent to name the same executors as Verna did, and to carry out her wishes with respect to the windfall which so unexpectedly came to her.

It was the duty of Mr. Spahr and Mr. Hart, acting for Girard, as executors under Verna's will, to inform Mrs. Powell that the gifts to charity made by Verna would be void and that the funds would vest in her, unless she agreed to validate the gifts. If any undue influence was exercised in this case, it is at this point that it would have had to be applied, because unless Mrs. Powell refused to validate the charitable gifts, the second administration of the funds would not have been necessary. Only in the event of her refusal would Mr. Spahr and Girard have become entitled to the additional fees and commissions which obviously would have been the only motive for their influencing Mrs. Powell in any manner. But it is abundantly clear from contestants' witnesses that Mrs. Powell did not wish the charities to receive the funds under Verna's will. She wanted to have control of the million dollars herself. Having reached this decision, it became important for her to draw a new will. The one she made on December 1, 1962, was of no value, since under it all of her estate went to Verna, who was dead. The evidence is clear and uncontradicted that neither Mr. Spahr nor Mr. Hart was personally interested, either as director, officer, trustee or member of any of the 11 charities benefitted by Mrs. Powell's will. It would have made no difference to Mr. Spahr, to Mr. Hart or Mr. Hart's employer, Girard, who would receive Mrs. Powell's estate, as they would have been entitled to the same compensation whether the entire

estate was left to the charities or to the contestants, or to any other individuals or institutions. It was perfectly natural for Mrs. Powell to make her new will as she did. In this manner she disposed of Verna's money in the manner Verna had designated, but, at the same time, retained complete control over the funds, so that she could have changed the manner of distribution at any time to suit her own pleasure and wishes. It may be unfortunate that Mrs. Powell did not actually make a new will while she was in her terminal illness in the Presbyterian Hospital, as Mrs. Guest and her daughter, Mrs. Harter, who were contestants' witnesses, testified she informed them she wished to do. At any rate, it seems to be crystal clear that not a single one of the relatives who would benefit if the will, which is being attacked, were set aside, would have been remembered in such a writing.

The hearing judge is firmly of the opinion that a verdict of a jury in favor of the contestants would have to be set aside as against the weight of the evidence. The request for an issue to be tried by a jury is, therefore, denied, and we enter the following:

### DECREE

And now, January 8, 1968, the appeal from the decree of the register of wills dated August 10, 1964, admitting to probate as the last will and testament of Elizabeth L. Powell dated May 23, 1963, is dismissed, and the record is remitted to the register of wills.

### SUR EXCEPTIONS TO OPINION

SAYLOR, J., March 8, 1968.—A careful reading of the record of this will contest indicates that the hearing judge committed no error in his evaluation of the testimony and his finding of fact and his application of the law thereto. Every other member of this court would have reached the same conclusion.

The positive testimony of the scrivener, of the other

subscribing witness to the will and of the physician, a competent and respected practitioner, who attended decedent before and immediately after its execution, conclusively evidence her possession of testamentary capacity at the time of its execution. Decedent, while afflicted with various ailments at age 80, was a strong-minded person who knew both what she wanted to do and what she had done when she directed the preparation of the probated will and when she executed it. Her mental capacities were not impaired.

Minor differences and apparent inconsistencies in the testimony of the scrivener and of the other subscribing witness amount to nothing more than a basis for suspicion which the essential facts do not justify. Such inconsistencies are actually evidence of the absence of any prearranged agreement as to what the testimony of these witnesses should and would be. They thus render their testimony on the real matters of substance more worthy of credence. Inconsistencies of the kind appearing in their testimony are of a character and quantity normal after the passage of years following the events described.

The burden of establishing undue influence was not successfully borne by the contestants. The record shows that decedent, while having bodily infirmity, was not weakened mentally. The burden did not shift to the proponents at any time during the litigation, even if it had been established that the scrivener and the other subscribing witness had a confidential relationship with decedent, and even though both the scrivener and the corporate fiduciary of which the subscribing witness is an officer were named as executors. To that extent, they had an interest in the will, but not one that would raise the presumption that they exercised undue influence in its execution.

The exceptions are dismissed, and the opinion of the hearing judge is confirmed absolutely.